**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

|  |  |
|---|---|
| JASMINE MAYRANT,<br><br>      Plaintiff,<br><br>v.<br><br>NORFOLK REDEVELOPMENT AND<br>HOUSING AUTHORITY, a political<br>subdivision of the Commonwealth,<br><br>      Defendant. | Civil No.: **2:24-cv-715** |

**PLAINTIFF JASMINE MAYRANT'S BRIEF IN SUPPORT
OF MOTION FOR DEFAULT JUDGMENT**

Plaintiff, Ms. Jasmine Mayrant ("Ms. Mayrant"), by counsel, pursuant to Local Rule 7, hereby submits her Brief in Support of Her Motion for Default Judgment.

**INTRODUCTION**

Ms. Mayrant, a public housing resident at a dwelling unit owned and managed by Norfolk Redevelopment and Housing Authority ("NRHA"), is legally blind. Compl. ¶ 1, ECF No. 1. At the outset of her tenancy in June 2024, she made a simple request: that as a result of her disability,[1] NRHA issue all communications and notices to Ms. Mayrant and her attorney by email. *Id*. Having an electronic copy of such documents allows Ms. Mayrant to magnify them on a computer or phone and read them in differential lighting. *Id*. Shortly after, NRHA formally granted the accommodation. *Id*. ¶ 2. Yet since then, NRHA has consistently and inexplicably refused or failed to implement the accommodation for nearly five months and counting. *Id*. Ms. Mayrant's counsel tried to resolve this without litigation several times to no avail. *See id*. This lawsuit under the Fair

---

[1] The term "handicapped" under 42 U.S.C. § 3602(h) is synonymous with the term "disabled." *See, e.g.*, *Helen L. v. DiDario*, 46 F.3d 325, 330 n.8 (3d Cir. 1995) (citation omitted).

Housing Act ("FHA") followed. Count I alleges NRHA constructively denied her reasonable accommodation request, violating 42 U.S.C. § 3604(f)(3)(B), while Count II alleges disparate treatment on the basis of disability, violating 42 U.S.C. § 3604(f)(2)(A). Ms. Mayrant sought a declaratory judgment; preliminary and permanent injunctive relief; compensatory and punitive damages; and attorney's fees and costs. Compl. ¶¶ 27 –28, ECF No.1; *id*. at 11–12.

NRHA is now in default. ECF No. 8. Ms. Mayrant seeks a default judgment only as to Count I, the failure-to-accommodate claim. Taking the complaint's factual allegations as true, as the Court must, the complaint plausibly alleges NRHA constructively denied Ms. Mayrant's request for an accommodation. Ms. Mayrant seeks a declaratory judgment and a permanent injunction that orders NRHA to implement the accommodation forthwith. She seeks $250,000 in compensatory damages and $400,000 in punitive damages, as well as her attorney's fees and costs.

## BACKGROUND

### I. Factual Allegations

NRHA is a political subdivision of Virginia under Va. Code § 36-4 and a public housing agency under 42 U.S.C. § 1437a(b)(6)(A). Compl. ¶ 8, ECF No. 1. It was created to help address the acute shortage of decent, affordable, and safe dwellings for low-income families. *Id*. As a public housing agency, NRHA receives federal funds to operate the public housing program in Norfolk, Virginia, which it is required to operate in compliance with federal law. *Id*. With a "$100 million annual capital and operating budget," according to its own website, NRHA is the "largest redevelopment and housing authority in Virginia and a national leader in real estate development and property management." *Id*. (quoting NRHA, *About Us* (last accessed Dec. 13, 2024), https://perma.cc/4B6W-6G32). Since June 12, 2024, Ms. Mayrant, a single mother of two minor children, has been a low-income public housing tenant at a dwelling unit owned and managed by

NRHA. *Id*. ¶ 9. NRHA's custom, policy, and practice is to issue notices and communications to residents by sending a hard copy of such documents in regular size font. *Id*. ¶ 10.

**A.    NRHA formally grants Ms. Mayrant's request for a reasonable accommodation.**

Ms. Mayrant is a person with disabilities. *Id*. ¶ 11. Among other diagnoses, Ms. Mayrant has a congenital condition affecting one eye that renders her completely blind in that eye, and her other eye has a vision of 20/600. *Id*. According to the American Foundation for the Blind, "20/200 vision is the clinical definition for legal blindness," so a "person with 20/600 vision is considered legally blind." *Id*. ¶ 11 n.3 (citations omitted). To put this into perspective, one with 20/600 vision sees something at 20 feet away that a person with typical 20/20 vision sees at 600 feet. *Id*. (citations omitted). Thus, Ms. Mayrant is legally blind and unable to read hard copy documents in regular font. *Id*. So she requires an electronic copy of documents so that she can magnify them on a computer or phone and read with differential lighting. *Id*.

On June 12, 2024, Ms. Mayrant signed a lease for herself and her two minor children for a public housing unit with NRHA. *Id*. ¶ 12. While at the rental office, Ms. Mayrant told the NRHA representative assisting her she was legally blind and could not read documents.  *Id*. Ms. Mayrant was accompanied by a representative from the Legal Aid Society of Eastern Virginia ("LASEV") who read the documents to her. *Id*. Ms. Mayrant cannot tell where she needs to sign something unless someone has their finger on the page, and she needs to have the paper an inch or two from her eye to see the finger. *Id*.

On July 1, 2024, LASEV submitted a letter to NRHA requesting a reasonable accommodation for Ms. Mayrant. *Id*. ¶ 13. The letter stated that Ms. Mayrant was legally blind and asked that all notices and written communications from NRHA be provided simultaneously to Ms. Mayrant and LASEV by email. *See* Ex. A ("Accommodation Request"), ECF No. 1-2. As noted in the letter, this accommodation was necessary for Ms. Mayrant to have equal use and

enjoyment of her dwelling. Compl. ¶ 13, ECF No. 1. On July 18, 2024, NRHA sent a letter by email to Ms. Mayrant and LASEV approving the accommodation and specified that "[a]ll written communications and notices from NRHA will be provided to both Ms. Mayrant and Ms. Bonfiglio at the same time to the following emails: mayrantjasmine24@gmail.com and Legal Aid – MelissaB@laseva.org." *Id*. ¶ 14; Ex. B ("NRHA Resp."), ECF No. 1-3.

**B.    Despite formally granting the accommodation, for nearly five months and counting NRHA has consistently and inexplicably failed to implement it.**

Despite acknowledging Ms. Mayrant's disability and agreeing to the reasonable accommodation request, NRHA has consistently, willfully, and inexplicably refused or failed to provide documents to Ms. Mayrant or LASEV in an electronic format. *Id*. ¶ 15. On October 8, 2024, LASEV emailed NRHA and its counsel, noting Ms. Mayrant's 8-year-old daughter found a hard copy inspection notice dated September 27, 2024, on Ms. Mayrant's door. *Id*. ¶ 16; Ex. C ("LASEV Oct. 8 Email"), ECF No. 1-4. That notice was not provided by email to Ms. Mayrant or LASEV, in violation of the reasonable accommodation. Compl. ¶ 16, ECF No. 1. Although that notice stated an inspection would occur on October 1, 2024, no one from NRHA came to do the inspection. *Id*. The October 8 email noted NRHA was violating fair housing law and requested that all notices immediately be emailed to Ms. Mayrant and LASEV. *Id*. NRHA never replied. *Id*.

Soon after, NRHA sent three more hard copy notices to Ms. Mayrant. *Id*. ¶ 17. The first is a lease cancellation notice dated October 8, 2024, alleging Ms. Mayrant owed $4.00 in rent. Ex. D ("Oct. 8 Termination Notice"), ECF No. 1-5. Ms. Mayrant then became aware of another hard copy notice placed on her door introducing the new property manager, along with a document titled, "Important Message for All [] Residents!!!" Compl. ¶ 17, ECF No. 1; Ex. E ("Misc. NRHA Notices"), ECF No. 1-6. Neither notice was emailed to Ms. Mayrant or LASEV. Compl. ¶ 17, ECF No. 1. A few days later, Ms. Mayrant realized she received a hard copy of a monthly rent statement

for November 2024, which was not emailed to her or LASEV. *Id*. ¶ 18; Ex. F ("Nov. Rent Stmt"), ECF No. 1-7. It is NRHA's custom, practice, and policy to send monthly rent statements to each tenant that notifies the tenant of their monthly rent, any excess utility charges incurred, any maintenance or service charges, and any other fees assessed to the tenant's account. Compl. ¶ 19, ECF No. 1.Tenants typically receive their monthly rent statements in the last two weeks of the month. *Id*. Yet NRHA has never sent a rent statement by email to Ms. Mayrant or LASEV. *Id*.

Ms. Mayrant has periodically received envelopes in the mail slot or posted on her door that she has either misplaced or has not opened promptly because she cannot read hard copy notices. *Id*. ¶¶ 20–21. Receiving them causes her great stress and embarrassment as she cannot read them and worries that she is missing something important. *Id*. ¶ 20. She sometimes asks her 8-year old daughter to read notices to her, but that compounds her stress because she doesn't want to worry her daughter and she cannot verify that her daughter is reading the notices correctly and completely. *Id*.  Before filing this action, Ms. Mayrant opened a stack of envelopes and found additional rent statements that were sent to her only in hard copy. *Id*.

On October 31, 2024, LASEV sent a letter to NRHA by mail and email, noting Ms. Mayrant was continuing to receive hard copy documents, and that NRHA was discriminating against Ms. Mayrant on the basis of her disability by failing to email her written communications and notices. *Id*. ¶ 22. That letter again requested that all notices and written communications be emailed to Ms. Mayrant and LASEV, that the October 8, 2024, lease cancellation notice be rescinded, and that a tenant ledger be provided to LASEV by email. *See* Ex. G ("LASEV Oct. 31 Letter"), ECF No. 1-8. NRHA acknowledged receipt of the letter but has still failed to send Ms. Mayrant and LASEV any notices or communications by email. Compl. ¶ 22, ECF No. 1. Nor did NRHA reply to the letter's request to rescind the lease cancellation notice or provide a ledger. *Id*.

5

At the end of November 2024, Ms. Mayrant became aware of a hard copy notice that was posted on her door notifying all residents of housekeeping inspections that would be conducted between December 2 and December 6. *Id.* ¶ 23. That notice was never emailed to Ms. Mayrant or LASEV. *Id.*; *see also* Ex. H ("Nov. Inspection Notice"), ECF No. 1-9. In early December 2024, Ms. Mayrant was alerted that she received a hard copy document titled, "Notice of Lease Review of Continued Occupancy," stating she had a meeting with the property manager set for December 18, 2024 at 9:30 a.m. Compl. ¶ 24, ECF No.1. Neither Ms. Mayrant nor LASEV received an email of that notice. *Id. See also* Ex. I ("NRHA Notice of Lease Review"), ECF No. 1-10.

Ms. Mayrant also received a hard copy document titled "Inspection Notice," stating her unit would be inspected on December 9, 2024. Compl. ¶ 25, ECF No. 1. That notice was never emailed to Ms. Mayrant or LASEV. *Id.*; Ex. J ("Dec. Inspection Notice"), ECF No. 1-11. The inspection was not conducted on December 9, 2024, and was instead conducted—without notice to Ms. Mayrant or LASEV—the following day. Compl. ¶ 26, ECF No. 1. During the inspection, an NRHA employee asked Ms. Mayrant to sign a form related to the inspection, despite NRHA being aware of her visual impairment. *Id.* Ms. Mayrant was unable to read the form but signed it, as she was embarrassed and was told signing it confirmed the inspection was conducted. *Id.*

NRHA's blatant disregard for Ms. Mayrant's civil rights has caused her great emotional and physical distress. *Id.* ¶¶ 27-28. Ms. Mayrant's declaration discusses this subject in more detail, and is addressed below. *E.g.* Mayrant Decl. ¶¶ 7, 10–12, 14–15, 17–19, 21–22,  ECF No. 10-3.

## II.      Procedural History

On December 13, 2024, Ms. Mayrant filed a two-count complaint against NRHA. Compl., ECF No. 1. That same day, plaintiff's counsel emailed a courtesy copy of the complaint to counsel for NRHA, namely, Ms. Haley Ramthun and Ms. Delphine Carnes. *See* Ex. A to Br. Supp. Def. Judg., ECF No. 10-1. In that email, plaintiff's counsel observed that they "expect service of process

to be effectuated by the end of next week or so." *Id*. NRHA never replied to that email. But on December 18, 2024, plaintiff's counsel emailed Ms. Ramthun and Ms. Carnes, among other NRHA officials, inquiring if Ms. Mayrant's Grounds to Appear ("GTA") was still set for Friday given Ms. Mayrant's pending litigation against NRHA. *See* Ex. B to Br. Supp. Def. Judg., ECF No. 10-2. Ms. Carnes replied, copied NRHA's Executive Director, and explained the meeting was cancelled. *Id*. NRHA was served with process on December 18, 2024. Proof of Service at 2, ECF No. 5. NRHA's answer was thus due on January 8, 2025. ECF No. 5. No answer or responsive pleading was filed, so NRHA's default was entered on January 14, 2025.

## STANDARD OF REVIEW

### I.      The two-step process under Federal Rule of Civil Procedure 55

Federal Rule of Civil Procedure 55 provides a two-step process for obtaining a default judgment. Fed. R. Civ. P. 55; *Minnesota Life Ins. Co. v. Alexander*, 694 F. Supp. 3d 742, 746 (E.D. Va. 2023). First, the clerk must enter a party's default when it "has failed to file a responsive pleading 'or otherwise defend' the action within the applicable time limit." *Transportation Dist. Comm'n of Hampton Roads v. U.S. Workboats, Inc.*, No. 2:21-cv-181, 2021 WL 8445262, at *2 (E.D. Va. Sept. 17, 2021) (citing Fed. R. Civ. P. 55(a)). Once a party's default is entered, the party may not answer or otherwise respond to the lawsuit unless it can successfully set aside the default. *See* Fed. R. Civ. P. 55(c). Second, the party not in default must move for a default judgment. *Id*.(b). Unlike an entry of default, "a default judgment determines the parties' rights and remedies." *Alexander*, 694 F. Supp. 3d at 746. Where, as here, the non-defaulting party seeks non-liquidated damages, she must seek relief from the court. *See* Fed. R. Civ. P. 55(b)(1)–(2).

### II.     Default Judgment Standard

Prior to entering default judgment, a court must ensure it has jurisdiction over the claims and parties, venue is proper, and "the defaulted party received proper service of process." *Empire*

*Fire & Marine Ins. Co. v. Pandt-Brown*, 322 F. Supp. 3d 694, 696 (E.D. Va. 2018) (citation and internal quotation marks omitted). The court must then evaluate if the complaint states a plausible claim to relief. "[W]ell-pleaded allegations of fact" must be accepted as true. *Alexander*, 694 F. Supp. 3d at 746 (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)). "In determining whether allegations are plausible, the reviewing court may draw on context, judicial experience, and common sense." *Old Dominion Util. Servs., Inc. v. Watermark Env't, Inc.*, No. 2:19-cv-238, 2020 WL 13606136, at *2 (E.D. Va. Mar. 23, 2020) (citation omitted).

"Once a court concludes that liability is established," *id.*, it must determine the "appropriate relief." *Transportation Dist. Comm'n of Hampton Roads*, 2021 WL 8445262, at *4. To do so, the court may conduct a formal evidentiary hearing, direct the plaintiff to produce supporting documentation, or even order limited discovery before entering judgment. *Old Dominion Util. Servs., Inc.*, 2020 WL 13606136, at *2 (citations omitted); *Alstom Power, Inc. v. Graham*, No. 3:15-cv-174, 2016 WL 354754, at *3 (E.D. Va. Jan. 27, 2016); Fed. R. Civ. P. 55(b)(2). For example, this Court has granted a motion for default judgment as to liability, but deferred ruling on damages. *Transportation Dist. Comm'n of Hampton Roads*, 2021 WL 8445262, at *4.

## ARGUMENT

**I.**    **The Court has the power and authority to enter a default judgment, because it possesses jurisdiction over the claims and parties, and NRHA was properly served.**

### A.    Venue is proper, and the Court has jurisdiction over the claims and parties.

Venue is proper because the dispute giving rise to Ms. Mayrant's claims occurred in this judicial district. 28 U.S.C. § 1391(b)(2). And the Court has personal jurisdiction over NRHA, as it operates and does business in Norfolk, Virginia, and the alleged misconduct occurred within this judicial district. Compl. ¶¶ 6, 8–9, ECF No. 1. Finally, the Court has federal question jurisdiction over Ms. Mayrant's two FHA claims. 28 U.S.C. § 1343(a)(3); 28 U.S.C. § 1331; 42 U.S.C. § 3613.

8

**B.    Because the Senior Executive Assistant to NRHA's Executive Director was personally served, service of process was proper under federal and state law.**

NRHA was served with process on December 18, 2024. Specifically, the summons and complaint was served on the executive director's senior executive assistant, Mr. Jordan Powell. Proof of Service at 2, ECF No. 5. Mr. Powell represented to the process server he was authorized to accept process on behalf of Executive Director Nathan Simms. *See id*. Service of process on NRHA was thus proper under Virginia and federal law. *See* Fed. R. Civ. P. 4(j)(2)(A)–(B).

With respect to Virginia law, NRHA is a political subdivision of the Commonwealth of Virginia. Va. Code § 36-4. Service on such an entity may be effectuated in one of two ways. For one, a process server may serve one of the following officers: the "*director*, commissioner, chief administrative officer, attorney, or any member of the governing body of such entity[.]" Va. Code § 8.01-300(3) (emphasis added). For another, a process server may, as here, "leav[e] a copy with the person in charge of the office of any officer designated in subdivisions 1 through 4" of Va. Code § 8.01-300. Mr. Powell's formal title and express representations to the private process server renders him "the person in charge of the office of" NRHA's executor director. *Id*.

Turning next to federal law, Rule 4(j)(2)(A) provides service may be effectuated on a "state-created governmental organization" by "*delivering* a copy of the summons and of the complaint to its chief executive officer[.]" *Id*. (emphasis added). Unlike Rule 4(e)(2)(A), such language does not require *personal* service. *See Bland v. Fairfax Cnty.*, Va., 275 F.R.D. 466, 469 (E.D. Va. 2011) (construing the plain meaning of "delivering" as used in Rule 45(b)). For this and other reasons, courts have held service under Rule 4(j)(2)(A) is proper if, as here, the process server personally served an "agent of the chief executive officer [who] . . . represent[ed] that she [was] an appropriate recipient of service on behalf of the chief executive officer." *Nashville Cmty. Bail Fund v. Gentry*, 446 F. Supp. 3d 282, 300 (M.D. Tenn. 2020). *See also Neil v. Randolph*, No.

9

cv-09-6242, 2010 WL 1727809, at \*2–3 (E.D. La. Mar. 17, 2010), *report and recommendation adopted*, No. cv-09-6242, 2010 WL 1727806 (E.D. La. Apr. 28, 2010); *S.J., ex rel. S.H.J. v. Issaquah Sch. Dist.*, No. C04-1926, 2007 WL 764916, at \*2–3 (W.D. Wash. Mar. 8, 2007).[2]

Neither the Fourth Circuit nor any district court within this circuit has addressed whether personal service on an executive director's designated subordinate satisfies Rule 4(j)(2)(A)'s "deliver[y]" requirement. Virginia district courts have, however, construed Rule 45(b)(1), which similarly requires that the legal document—there, the subpoena—be "delivered" to the recipient. *Id*. In doing so, they have held that Rule 45(b)(1) does not require personal service on the recipient. *Bland*, 275 F.R.D. at 469 (plain meaning of "deliver" did "not foreclose sending [subpoena] via FedEx or certified mail."); *McAfee v. Boczar*, No. 3:11-cv-646, 2012 WL 2374173, at \*3 n.2 (E.D. Va. June 22, 2012) (posted service of subpoena on front door of residence by private process server was proper); *see also Doe v. Hersemann*, 155 F.R.D. 630, 630–31 (N.D. Ind. 1994) (a subpoena need not be personally served, in part because when the drafters desired to require personal service, they expressly required it, and citing as an example Rule 4(e)(1), which is now codified at 4(e)(2)(A)). Notably, adopting such reasoning for this case does not necessarily require the Court to accept the proposition that service by mail would be appropriate. *See, e.g.*, *Gentry*, 446 F.Supp. at 299 (reasoning "delivery" is a term of art that signifies something more than service by mail).

## II.   The Complaint plausibly alleges NRHA is liable under the FHA for failing to grant Ms. Mayrant's request for a reasonable accommodation.

The Fair Housing Amendments Act of 1988 added "handicap" as a protected trait to Title VIII of the Civil Rights Act of 1968. Pub. L. No. 100–430, 102 Stat. 1619 (codified at FHA, 42

---

[2] There is at least some contrary authority but such authorities do not meaningfully explain the basis for their conclusion. *Lee v. Caruso*, No.: 1:07-cv-139, 2009 WL 4042744, at \*2 (W.D. Mich. Nov. 20, 2009) (stating, without analysis, that Rule 4(j)(2)(A) requires plaintiff to personally serve the chief executive officer); Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1109 (4th ed.) (similar).

U.S.C. § 3601 *et. seq.*). Since then, the FHA has forbade discrimination against any person in the "terms, conditions, or privileges of . . . [the] rental of a dwelling, or in the provision of services . . . in connection with such dwelling, because of a handicap of . . . that person[.]" 42 U.S.C. § 3604(f)(2)(A). Disability discrimination includes the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" *Id*. § 3604(f)(3)(B).

The Fourth Circuit's framework for proving a failure-to-accommodate claim can be divided into two steps. First, a plaintiff must show the defendant expressly or constructively denied her request for an accommodation. *Scoggins*, 718 F.3d at 271–72 (citing *Groome Res. Ltd. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000)). Otherwise, the claim is not ripe for judicial adjudication. *Id*. at 270 (citing *Bryant Woods*, 124 F.3d at 602) (appearing to state this requirement implicates the Article III case-or-controversy limitation and is not an element of the claim).

Once this prerequisite is satisfied, the plaintiff must establish she has a disability, and that she requested an accommodation that is "(1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn, Inc. v. Howard Cnty., Md*., 124 F.3d 597, 603–04 (4th Cir. 1997) (citing 42 U.S.C. § 3604(f)(3)(B)); *see also Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013) (reiterating this three element test). Notably absent is any requirement that discriminatory intent be shown. *E.g. Evans v. ForKids, Inc.*, 306 F. Supp. 3d 827, 836–37 (E.D. Va. 2018) (collecting cases). Nor must one show she exhausted her federal or state administrative remedies. *Bryant Woods Inn, Inc.*, 124 F.3d at 601 (citing 42 U.S.C. § 3613(a)(2)).[3]

---

[3] As Judge Davis observed, circuits differ on a failure-to-accommodate claim's elements. *Evans*, 306 F. Supp. 3d at 837 n.10. In addition to those articulated by the Fourth Circuit, some treat the

Courts evaluating FHA failure-to-accommodate claims may consult caselaw construing Section 504 of the Rehabilitation Act of 1974 (codified at 29 U.S.C. § 794(a)) ("Rehabilitation Act"), along with comparable provisions of the Americans with Disability Act of 1990 ("ADA") (codified at 42 U.S.C. § 12112(b)(5)(A) (private employers); 42 U.S.C. § 12132 (public entities); 42 U.S.C. § 12182(b)(2)(A) (public accommodations)). After all, Congress imported the concept of "reasonable accommodations" from the Rehabilitation Act. *Bryant Woods Inn, Inc.*, 124 F.3d at 603 (citations omitted). And the failure-to-accommodate provisions of the ADA and FHA share similar language and aims. *See, e.g.*, *Evans v. UDR, Inc.*, 644 F. Supp. 2d 675, 679 n.8 (E.D.N.C. 2009) (citing *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1149 (9th Cir. 2003)). Courts also consult a joint guidance document issued by the Department of Justice ("DOJ") and Department of Housing and Urban Development ("HUD"). *Evans*, 306 F. Supp. 3d at 841 (quoting *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285–86 (11th Cir. 2014) (quoting DOJ & HUD, *Joint Statement on Reasonable Accommodations* 11 (May 17 2004), https://perma.cc/82BB-6YHS)). Even post *Chevron*, courts may afford *Skidmore* deference to such guidance documents. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024) (cleaned up).

A.     **Ms. Mayrant satisfies each element of her failure-to-accommodate claim.**

a.     **While NRHA formally granted the rudimentary accommodation request, Ms. Mayrant plausibly alleges NRHA constructively denied it by neither implementing it, nor engaging with her, for nearly five months and counting.**

"A denial of a request need not be explicit, but rather may be treated as a 'constructive' denial based on the decision maker's conduct." *Scoggins*, 718 F.3d at 271–72 (citing *Groome Res.*

---

accommodation's denial as an element; others also require a showing that the defendant knew or should have known of the disability. *Id*. Here, Ms. Mayrant repeatedly informed NRHA of her disability. Compl. ¶¶ 12–14, 16, 22, 26, ECF No. 1. And she plausibly alleges a constructive denial and facts that satisfy the elements the Fourth Circuit previously articulated. Thus, to the extent there is any doctrinal ambiguity, the Court need not address it. *See Evans*, 360 F. Supp. 3d at 840.

*Ltd., LLC v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000)); *accord* Dep't of Justice & HUD, *Joint Statement on Reasonable Accommodations*, *supra*, at 11. That is because an "indeterminate," unjustifiable delay "has the same effect as an outright denial." *Groome Res. Ltd., LLC*, 234 F.3d at 199. Put another way, a defendant who "cause[s] a breakdown in the [interactive] process" through, for example, obstruction or failing to communicate cannot evade liability by merely averring it did not *formally deny* the accommodation. *E.g. Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (ADA) (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir. 1996)); *Chavez v. Aber*, 122 F. Supp. 3d 581, 597 (W.D. Tex. 2015) (FHA); Dep't of Justice & HUD, *Joint Statement on Reasonable Accommodations*, *supra*, at 9 (same).

Most constructive-denial claims are premised upon the landlord's failure to grant or deny the accommodation. The logic for allowing such claims, however, plainly applies to cases like Ms. Mayrant's. A tenant whose accommodation request is formally granted—but never implemented—is harmed in the same manner as one whose accommodation is neither granted nor denied. Each tenant's accommodation is effectively denied. *See Groome Res. Ltd., LLC*, 234 F.3d at 199. Caselaw, though scant, supports this straightforward logic. For instance, the First Circuit held that a reasonable jury could conclude the defendant violated the Rehabilitation Act by "failing fully to implement the accommodations it had agreed to[.]" *Enica v. Principi*, 544 F.3d 328, 343 (1st Cir. 2008) (footnote omitted); *see also id*. at 342 (stating if an entity formally grants the accommodation, it must "act reasonably in implementing [it]." (citations omitted)).

While this is a "fact-specific inquiry," *Evans*, 306 F.Supp.3d at 842 (citation omitted), caselaw supports the proposition that an unjustifiable delay in granting the accommodation for several months constitutes a constructive denial. *E.g. Groome Res. Ltd., LLC*, 234 F.3d at 199 (an

13

unjustified failure to act for over three months on accommodation request could constitute constructive denial); *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc*., 765 F.3d 1277, 1286–87 (11th Cir. 2014) (defendant had sufficient information to grant accommodation, which discredited the claim it was "meaningful[ly] review[ing]" the request for more than six months).

That proposition applies equally here. True, NRHA formally granted the request on July 18, 2024. Compl. ¶ 14, ECF No. 1; NRHA Resp., ECF No. 1-3. Yet since then, NRHA has *not once* emailed notices and communications to Ms. Mayrant and counsel. Compl. ¶¶ 2 –3, 15–19, 20, 22–25, ECF No. 1. That is nearly five months of consistent noncompliance. *Compare id*. (complaint filed on December 13, 2024), *with* NRHA Resp., ECF No. 1-3 (granting request). And although Ms. Mayrant's counsel twice confronted NRHA with these concerns, NRHA failed or refused to make *any effort* to engage in an interactive process. *E.g.* Compl. ¶¶ 34–35, ECF No. 1.

Moreover, it is implausible to infer from the allegations that NRHA lacked proper notice of its noncompliance, or that NRHA's months-long (and still counting) delay in implementing the rudimentary accommodation was necessary. When granting the accommodation on July 18, 2024, NRHA's accommodation specialist, Ms. Rhonda Rich, conveyed that Ms. Mayrant may raise any issues with her or Ms. Valerie Brandon-Hamlin, Ms. Mayrant's then-property manager. NRHA Resp., ECF No 1; LASEV Oct. 8 Email at 2, ECF No. 1-4. Carbon copied to Ms. Rich's email was Ms. Brandon-Hamlin; Ms. Brenda Fleming, NRHA's Director of Property Management; and a Mr. Corey Brooks. *Id*. So, on October 8, 2024, Ms. Mayrant's counsel, by email, brought NRHA's consistent noncompliance to the attention of Ms. Brandon-Hamlin; Ms. Fleming; Mr. Brooks; and NRHA's attorney, Ms. Haley Ramthun. Compl. ¶ 16, ECF No. 1; LASEV Oct. 8 Email, ECF No. 1-4. NRHA, however, never replied to that correspondence, and the noncompliance persisted. *E.g.* Compl. ¶¶ 16, 22–26, ECF No. 1.

Still seeking to avoid litigation, on October 31, 2024, Ms. Mayrant's counsel, by email and mail, brought NRHA's continued noncompliance to the attention of Ms. Rich; Ms. Sheila Sermon, Ms. Mayrant's new property manager; Ms. Ramthun; Ms. Fleming; and Mr. Brooks. Comp. ¶ 22, ECF No. 1; Misc. NRHA Notices, ECF No. 1-6; LASEV Oct. 31 Letter at 1–4, ECF No. 1-8. Counsel carbon copied the main email address for Ms. Mayrant's property. *See* LASEV Oct. 31 Letter at 3, ECF No. 1-8. Although Ms. Fleming asked Ms. Rich to respond, *see id.*, no one replied, and the noncompliance and lack of communication persisted. Compl. ¶¶ 22–26, ECF No. 1.

In sum, the well-pled facts demonstrate NRHA inexplicably failed or refused to implement a rudimentary accommodation request—which it formally granted—for nearly five months and counting. This, when paired with NRHA's complete refusal to engage in an interactive process, constitutes a plausible claim of constructive denial. To hold otherwise would not only defy logic, but would also signify to landlords and others that the FHA need not be taken seriously. Tenants, let alone public housing tenants, should not be made to beg for compliance with the FHA. Ms. Mayrant has waited long enough—her claim is ripe for judicial adjudication.

> **b.      Ms. Mayrant is legally blind and thus plausibly alleges she has a disability.**

Under the FHA, an individual has a "handicap"—that is, a disability—when she either: "(1) [has] a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) [has] a record of having such an impairment, *or* (3) [is] . . . regarded as having such an impairment[.]" 42 U.S.C. § 3602(h) (emphasis added). Ms. Mayrant undoubtedly satisfies this definition's first component, so the Court need not address the last two. *But see* Compl. ¶ 31, ECF No. 1 (alleging each component of disjunctive definition is satisfied). Ms. Mayrant is legally blind. *Id.* ¶¶ 1, 11–12, 31. So she of course has a physical impairment. 24 C.F.R. § 100.201(a)(1) (defining "physical or mental impairment," in part, as any "physiological disorder

or condition, cosmetic disfigurement, or anatomical loss affecting . . . [the] special sense organs[.]"). And because Ms. Mayrant's impairment renders her legally blind, it follows that it substantially limits major life activities, namely, her vision. *Id.*(b); *Runnebaum v. NationsBank of Maryland, N.A.*, 123 F.3d 156, 166 n.5 (4th Cir. 1997) (en banc) (recognizing in ADA context that "some conditions," like "blindness," will "always constitute impairments that substantially limit the major life activities of the afflicted individual."), *overruled on other grounds by Bragdon v. Abott*, 524 U.S. 624 (1998). This element is satisfied.

### c.     Ms. Mayrant plausibly alleges that the requested accommodation affords her an equal opportunity to use and enjoy her housing.

The "equal opportunity" element is satisfied by demonstrating the desired accommodation does not "increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap." *Bryant Woods Inn, Inc.*, 124 F.3d at 604. Ms. Mayrant does not request an accommodation that would afford her a benefit unavailable to those without her disability. Rather, she requests this accommodation to ensure she has an "equal opportunity to use and enjoy" her housing on the same terms as others who are not legally blind.

### d.     Ms. Mayrant plausibly alleges the accommodation is necessary, as it directly ameliorates effects of her impaired vision by enabling her to apprise herself of important and general information about her use and enjoyment of the home.

This element is satisfied by showing the accommodation "direct[ly] ameliorat[es]" the effects of a person's disability. *Bryant Woods, Inc.*, 124 F.3d at 604 (citing *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)). That is, one must show the accommodation "*may be* necessary to afford [her] [an] equal opportunity *to use and enjoy* [her] dwelling[.]" 42 U.S.C. § 3604(f)(3)(B) (emphasis added). The complaint plausibly alleges the effects of Ms. Mayrant's legal blindness— namely, being unable to apprise herself of general and important information concerning the use and enjoyment of the home—would be directly ameliorated by the accommodation.

Ms. Mayrant is legally blind. Compl. ¶¶ 1, 11–12, 31, ECF No. 1. She is completely blind in one eye. *Id*. ¶ 11. Her other eye has a vision of 20/60, meaning that what she sees at 20 feet away equates to what a person with typical 20/20 vision sees at 600 feet. *Id*. n.3 (citations omitted). As a result, Ms. Mayrant is unable to read hard copy documents in regular font. *Id*. ¶ 11. To properly read a document, she views it electronically so that she can magnify it on a computer or phone and read it with differential lighting. *Id*. ¶ 11. Indeed, even signing physical documents on her own is nigh impossible. *See id*. ¶ 12. In such situations, she requires someone to place a finger on where to sign; she then places the document an inch or two from her eye so that she can see the finger. *Id*. And because of her poor vision, she often misses envelopes and does not see notices posted on her door or placed in her mail slot. *E.g. id*. ¶¶ 20–21.

Because NRHA has solely communicated with Ms. Mayrant by mail or hand delivery, Ms. Mayrant has been unable to apprise herself of important information concerning her tenancy. *E.g. id*. ¶¶ 17, 20, 33, 43. She has been unable to independently ascertain, for example, that inspections would occur; that her lease might be terminated if certain action was not taken; how much, if anything, she owes NRHA; and the contents of a form an NRHA employee asked her to sign (despite articulating her disability to him). *E.g. id*. ¶¶ 16–18, 20, 23, 25–26, 43; LASEV Oct. 8 Email, ECF No. 1-4; Oct. 8 Termination Notice, ECF No. 1-5; Nov. Rent Stmt, ECF No. 1-7; Nov. Inspection Notice, ECF No. 1-9; Notice of Lease Review, ECF No. 1-10; Dec. Inspection Notice, ECF No. 1-11. Further, public housing tenants must comply with several annual and interim certification requirements as to their income, household composition, and more. *E.g.* 24 C.F.R. §§ 5.216, 5.230, 960.257, 960.259, 966.4(c). To comply, tenants must often compile copious documentation and attend in-person appointments. Noncompliant tenants receive a lease termination notice and, eventually, an eviction summons. *See, e.g.*, 24 C.F.R. §§ 5.218(c),

5.232(a), 966.4(c). So Ms. Mayrant's inability to read communications and notices puts her at risk of losing *all* "use and enjoy[ment]" of her home. 42 U.S.C. § 3604(f)(3)(B) (emphasis added).

More generally, Ms. Mayrant has been unable to independently apprise herself of updates and services provided to all residents. *E.g.* Compl. ¶¶ 17, 20, 33, 43, ECF No. 1; Misc. NRHA Notices, ECF No. 1-6. That, too, undercuts her ability to "use and enjoy" her home on equal terms with non-disabled residents. 42 U.S.C. § 3604(f)(3)(B). For these reasons, the complaint plausibly alleges the accommodation directly ameliorates the effects of Ms. Mayrant's disability.

e.     **Ms. Mayrant plausibly alleges the accommodation is reasonable, because it neither imposes an undue burden, nor fundamentally alters NRHA's business.**

Broadly, an accommodation is reasonable if it neither imposes "*undue* financial and administrative burdens," nor fundamentally alters the program's nature. *Bryant Woods Inn, Inc.*, 124 F.3d at 604 (cleaned up) (emphasis added). The complaint alleges NRHA has a custom, policy, or practice of issuing notices and communications to residents by sending a hard copy of such documents in regular size font. Compl. ¶¶ 1, 10, 19, 32, ECF No.1. As an accommodation, Ms. Mayrant simply requested that NRHA issue all such communications and notices to her and LASEV by email. *Id*. ¶¶ 1, 13; Accommodation Request, ECF No. 1-2. By formally granting the accommodation, NRHA acknowledged it was reasonable and necessary. Compl. ¶¶ 2, 14, 34, ECF No. 1; NRHA Resp., ECF No. 1-3. This augurs in favor of finding the accommodation reasonable. *Jordan v. Greater Dayton Premier Mgmt.*, 9 F. Supp. 3d 847, 853–54 (S.D. Ohio 2014) (evidence that housing authority previously granted accommodation is relevant to reasonableness inquiry).

In any event, the Court need not solely rely on NRHA's formal grant of the accommodation. Far from imposing any financial or administrative burden, the accommodation, at best, alleviates NRHA from marginal lost time and costs associated with printing and delivering documents. At worse, any administrative and financial costs are plainly de minimus and thus, do

not impose an *undue* burden. *Bryant Woods Inn, Inc.*, 124 F.3d at 604 (cleaned up). It is difficult to imagine any landlord or managing agent could claim otherwise. But this proposition is especially true for NRHA, who touts itself as the "largest redevelopment and housing authority in Virginia," a "national leader in real estate development and property management," and as having a "$100 million annual capital and operating budget[.]" Compl. ¶ 8, ECF No. 1 (quoting NRHA, *About Us* (last accessed Dec. 13, 2024), https://perma.cc/4B6W-6G32)).

Nor is it plausible to suggest this rudimentary accommodation fundamentally alters NRHA's business of leasing, owning, and managing properties for low-income tenants. *Id*. ¶¶ 8, 10, 19, 32–33, 43. Rather, a fundamental aspect of its business is conveying general and important information to residents that pertain to their tenancy. *See id*. The accommodation merely alters the method by which NRHA accomplishes this aspect of business.

Further, the well-pled facts are devoid of any allegation or inference that NRHA ever suggested—let alone *could* suggest—that an alternative accommodation "more efficiently" achieved the same benefits as Ms. Mayrant's accommodation. *Bryant Woods Inn, Inc.*, 124 F.3d at 604. So the Court cannot evaluate the propriety of alternative accommodations. *Cf. Simmons v. T.M. Assocs. Mgmt., Inc.*, 287 F. Supp. 3d 600, 606 (W.D. Va. 2018) (declining to consider, at motion-to-dismiss stage, alleged non-discriminatory reason for denying tenancy application, as this fact was not in the complaint).

In short, the accommodation's benefits far outweigh the non-existent or de minimus burdens imposed on NRHA, and it does not fundamentally alter the program's nature. So the Complaint plausibly alleges the accommodation is reasonable and each element is satisfied. This conclusion is supported by comparable cases, where courts have found accommodations far more burdensome than Ms. Mayrant's reasonable. *Jordan*, 9 F. Supp. 3d at 863 (ordering housing

19

authority to "provide microcassette tapes of all written materials it sen[t] to [blind tenant]" pending case's resolution); *Robbins v. Connecticut Inst. for the Blind*, No. 3:10-cv-1712, 2012 WL 3940133, at *1 (D. Conn. Sept. 10, 2012) (blind tenant's accommodation claims survived summary judgment, as defendant failed to send notice of Section 8 recertification via audiotape).

### III. The Court should issue a permanent injunction.

The FHA authorizes courts to grant broad equitable relief. 42 U.S.C. § 3613(c)(1). To obtain a permanent injunction, a plaintiff must first prevail on the merits. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020) (citation omitted). Upon doing so, a plaintiff must traditionally demonstrate: (1) irreparable injury; (2) inadequacy of available remedies at law, like monetary damages; (3) the balance of hardships between the parties favor the plaintiff; and (4) the injunction is in the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010) (citation omitted). The burden of proof on those seeking a permanent rather than preliminary injunction does not turn on whether it is "mandatory" or "prohibitory." *See id*. at 156–58 (failing to articulate this as requirement); *Azar*, 973 F.3d at 274 (same). *See also Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019) (reasoning that the policy concern animating the mandatory-prohibitory distinction—that a court alters status quo only for a subsequent trial to show the decision was erroneous—is not implicated, as a permanent injunction requires actual success on merits). Ms. Mayrant should prevail, so the remaining elements are addressed in turn.

### A. Irreparable injury and the inadequacy of available remedies at law

Courts have held that where, as here, a plaintiff shows the defendant violated a statute that authorizes injunctive relief, irreparable harm may be presumed. *E.g. Env't Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 338 (4th Cir. 1983) ("Where a statute authorizes injunctive relief for its enforcement, plaintiffs not plead and prove irreparable injury." (citations omitted)); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) (FHA case).

20

Absent a presumption, Ms. Mayrant would satisfy these factors in three respects. First, if NRHA does not implement the accommodation, Ms. Mayrant's visual impairment makes it very likely she will miss important information, compliance deadlines, and so on. This, in turn, will lead to termination notices and, ultimately, an eviction action. The prospect of losing one's home—and the intangible harms associated with homelessness—is an irreparable injury for which there is no adequate remedy at law. *E.g. Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 328 (E.D.N.Y. 2012) (threat of eviction satisfies requirement for irreparable harm); *Johnson v. Macy*, 145 F. Supp. 3d 907, 919 (C.D. Cal. 2015) (same).

Second, although Ms. Mayrant is entitled to emotional distress damages, they cannot be calculated with mathematical precision; as such, the remedy at law is inadequate, and the harm would be irreparable. *See, e.g.*, *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) ("[I]rreparable injury is suffered when monetary damages *are difficult to ascertain* or are adequate." (citation and internal quotation marks omitted) (emphasis added)); *Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 696 (M.D.N.C. 2023) (collecting cases); *United States v. Matusoff Rental Co.*, 494 F. Supp. 2d 740, 756 (S.D. Ohio 2007) (awarding damages for emotional distress in FHA case, but nevertheless finding irreparable harm and inadequacy of legal remedies since such awards are difficult to calculate); *Safeway Inc. v. CESC Plaza Ltd. P'ship*, 261 F. Supp. 2d 439, 469 (E.D. Va. 2003) ("[S]howing that the harm suffered will be irreparable by the award of monetary damages is a common means of showing that the legal damages remedy is inadequate." (citation omitted)).

Finally, counsel twice tried to achieve voluntary compliance. NRHA's noncompliance continues to this day. Mayrant Decl. ¶ 21,  ECF No. 11-2. So the prospect that NRHA will persist

in its noncompliance absent an injunction is very real. *See, e.g.*, *Reyazuddin v. Montgomery Cnty., Maryland*, 754 F. App'x 186, 192 (4th Cir. 2018) (citations omitted).

## B.  Balance of hardships and the public interest

Ordering NRHA to implement the accommodation it has already agreed to would not impose any undue financial or administrative hardship. By contrast, Ms. Mayrant would continue to suffer the harm of not being granted an accommodation to which she is entitled to as a matter of law. She would also face a very real risk of losing her housing. Finally, the public interest is always served by enforcing the FHA's aim of eradicating discriminatory housing practices. *E.g. United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) (citations omitted).

## IV.  The Court should award Ms. Mayrant compensatory and punitive damages.

The FHA authorizes compensatory and punitive damages. 42 U.S.C. § 3613(c)(1). Entities like NRHA may be held vicariously liable for its agents' discriminatory acts. *Meyer v. Holley*, 537 U.S. 280, 282 (2003); *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 102 (2d Cir. 2024); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733–34 (E.D. Va. 1992).

## A.  An award of $250,000 in compensatory damages is appropriate.

Emotional distress damages caused by a defendant's discriminatory housing practices are recoverable. *E.g. Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 445 (E.D. Va. 2011) (citing *Banai v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. on Behalf of Times*, 102 F.3d 1203, 1207 (11th Cir. 1997) and *United States v. Balistrieri*, 981 F.2d 916, 931 (7th Cir. 1992)).[4] Emotional distress may be "inferred from the circumstances as well as proved by the testimony." *Id*. at 446 (citing *Marable v. Walker*, 704 F.2d 1219, 1220–21 (11th Cir. 1983)). A plaintiff's non-conclusory

---

[4] The Fourth Circuit upheld the *Matarese* court's $51,000 emotional-distress award and $100,000 punitive award, but vacated the injunction that ordered the landlord to simply "follow the law[.]" *Matarese v. Archstone Communities, LLC*, 468 F. App'x 283, 284 (4th Cir. 2012).

testimony, "standing alone, can support" such awards. *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)). Although such testimony must specify "how [their] alleged distress manifested itself," *id*. at 547 (citation and internal quotation marks omitted), the plaintiff "need not prove the exact measurement of damages for the harm suffered." *Matarese*, 795 F.Supp.2d at 446 (citing *Marable v. Walker*, 704 F.2d 1219, 1220–21 (11th Cir. 1983)). Nor is proof that a plaintiff sought out medical or psychological attention necessary. *See, e.g.*, *id*. at 448. The factfinder may consider many factors, including the degree of emotional distress, the context of the events surrounding it, and any mitigating circumstances. *Price*, 93 F.3d 1241 at (4th Cir. 1996) (citations omitted). The factfinder's determination will not be reversed absent an abuse of discretion. *See Hicks v. Ferreyra*, 64 F.4th 156, 162, 175–65 (4th Cir. 2023) (in *Bivens* case, finding no abuse of discretion and affirming $205,000 emotional-distress award and $525,000 punitive award, even though there was no medical testimony, economic loss, or physical injury), *cert. denied*, 144 S. Ct. 555 (2024).

Here, the degree of emotional distress, the context of the events surrounding it, and the lack of any mitigating circumstances support the compensatory damages sought. *Price*, 93 F.3d 1241 at (4th Cir. 1996) (citations omitted). The harms wrought by NRHA's brazen disregard for Ms. Mayrant's rights have been compounded by her preexisting physical and mental state. Ms. Mayrant tries her best to be independent and a role model for her children and other disabled persons. Mayrant Decl. ¶¶ 10–12, 14, ECF No. 11-2. But her life has been extremely challenging. She is diagnosed with post-traumatic stress disorder, anxiety, depression, and insomnia. Mayrant Decl. ¶ 7, ECF No. 11-2; Compl. ¶ 27, ECF No. 1. She is also a survivor of domestic violence. *Id*. At times, she becomes so anxious and stressed that it manifests as physical pain, rendering her immobile and in need of her wheelchair. Mayrant Decl. ¶ 7, ECF No. 11-2. Such incidents began

following a 2018 car accident in which she "wrecked her back/legs[.]" *Id.* She has a chronic history of homelessness and living in unsafe conditions. *Id.* ¶ 10. And she believes many do not perceive how difficult it is for visually impaired persons to complete daily and important tasks. *Id.* ¶ 11. Because it is still common for people and entities to convey important and general information through physical documents in regular-sized font, she finds herself having to request accommodations. *Id.* ¶ 11. But doing so is a frequent cause for embarrassment, anxiety, and sometimes humiliation, as she does not want people to view her as "less than them[.]" *Id.*

Thus, Ms. Mayrant was relieved to learn of NRHA's apparent willingness to accommodate her. *Id.* ¶ 10. Ms. Mayrant's relief, however, was soon tampered by the realization that NRHA would inexplicably persist in refusing to implement the accommodation. *Id.* ¶ 13. This has, and continues to, severely exacerbate Ms. Mayrant's already fragile physical and mental state. At first, she tried to ignore it, thinking NRHA would eventually do the right thing. *Id.* ¶ 14. But as time went on, Ms. Mayrant has grown more anxious and loses sleep over whether she will miss something important that causes her to lose her home. *Id.* ¶¶ 17–18. Sometimes she breaks down into tears. *Id.* ¶ 19. At times, she has "PTSD moments and flashbacks" to when she and her children were homeless. *Id.* ¶¶ 17–18. *See also id.* ¶ 10. As a survivor of domestic violence, she remains terrified that someone (especially a male) will unexpectedly walk in her unit to conduct an inspection she was unaware of. *Id.* ¶ 15. Her depression symptoms have risen. *See id.* ¶¶ 19, 21–22. And the occasions on which she is physically immobile from anxiety and stress have increased. *Id.* ¶¶ 7, 14, 22. Overall, she has found this entire process "embarrassing and humiliating," as she feels as if "NRHA is intentionally disrespecting [her] rights as a disabled person[.]" *Id.* ¶¶ 14; *see also id.* ¶ 20. She has "so many other stressful things going on in [her] life," and this ordeal continues to significantly impair her physical and mental state. *See id.* ¶ 22.

24

One final note. Courts also consult awards in other civil rights cases. *E.g. Matarese*, 795 F.Supp.2d at 448–49. While this is inherently a case-by-case inquiry, several courts have observed that "garden variety" emotional distress claims—that is, those "devoid of any medical treatment or physical manifestation," *Parris v. Pappas*, 844 F. Supp. 2d 271, 279 n.9 (D. Conn. 2012) (citations omitted)—"generally merit $30,000 to $125,000 awards." *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (cleaned up) (collecting cases as far back as 2005). *See generally* Robert G. Schwemm, *Relief in § 3613 cases—Evaluating intangible injuries*, Housing Discrimination Law and Litigation § 25:6 (Westlaw last updated July 2024) ["*Housing Discrimination Law and Litigation*"]. Even so, courts have approved higher emotional distress awards without medical proof. *See Fischer v. United Parcel Serv., Inc.*, 390 F. App'x 465, 472 (6th Cir. 2010) ($650,000). One court, for instance, awarded a quadriplegic $420,000 in emotional distress damages; no medical evidence was presented, but the FHA plaintiff testified that for seven months, he lacked access to an elevator and thus, had to crawl up and down the stairs. *Davis v. Lane Mgmt.*, LLC, 524 F. Supp. 2d 1375, 1376–77 (S.D. Fla. 2007). In justifying the compensatory award (and a punitive award of the same amount), the Court remarked that the sophisticated entity ignored plaintiff's requests to make financially feasible elevator repairs for months. *Id*. at 1378. Further, "[t]hat quadriplegics require elevators to ascend and descend stories need[ed] no explanation." *Id*. While not entirely comparable to the quadriplegic's physical plights, Ms. Mayrant has increasingly experienced spouts of immobility on account of anxiety, which is caused by NRHA's inexplicable refusal to implement an accommodation whose necessity and reasonableness is self-evident. Mayrant Decl. ¶ 7, 14, 22, ECF No. 11-2.

For all these reasons, an award of $250,000 in compensatory damages is reasonable.

**B.** **An award of $400,000 in punitive damages is appropriate and justified.**

Punitive damages are appropriate when the defendant's conduct is malicious or evinces a reckless indifference to others' federally-protected rights. *E.g. Quigley v. Winter*, 598 F.3d 938, 952–53 (8th Cir. 2010) (cleaned up) (in FHA case, upholding $250,000 punitive award). Reckless indifference is shown if a defendant "'discriminate[s] in the face of a perceived risk that [his] actions will violate federal law[.]'" *Id*. at 953 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). There is no legal impediment to the award sought here, and the amount is justified by the great need for deterrence, along with NRHA's egregious conduct, sophistication, and finances.

**a.** **Punitive damages are available against municipalities under the FHA.**

District courts are divided over whether punitive damages are authorized against a municipality or, as here, a political subdivision thereof. *E.g. Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 86 n.21 (D. Conn. 2019) (collecting cases). The Second Circuit—the only circuit court to have addressed this question—recently examined the FHA's text, statutory history, and legislative history and concluded the FHA allows punitive awards against municipalities and their instrumentalities. *Gilead Cmty. Servs., Inc.*, 112 F.4th at 102–04 (upholding $2 million punitive award against town). The Court should adopt the Second's Circuit's reasoning. Unlike 42 U.S.C. § 1983, which does not expressly authorize punitive damages, *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (holding punitive damages are unavailable against municipalities under Section 1983), 42 U.S.C. § 3613(c)(1)'s "text easily and unequivocally rebuts the common-law presumption" against the availability of punitive damages from municipalities. *Gilead Cmty. Servs., Inc.*, 112 F.4th at 103. Although the statute does not specifically say punitive damages are available against *municipalities*, Congress need not "speak with such granular detail on the issue." *Id*.; *id*. at 103–04. Yet in one respect, the statute *does* speak with such granular detail. The statute refers to the "person against whom" a discriminatory housing

26

practice is alleged in a private suit, 42 U.S.C. § 3613(b), and defines "person" broadly to include corporations. *Id*. at 101 (citing 42 U.S.C. § 3602(d)). *See also Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 126 (2003) (discussing understanding of municipalities as corporations "going back at least to Coke."). In any event, when Congress desired to exempt local governments from generally applicable remedies, "it has said so clearly." *Gilead Cmty. Servs., Inc.*, 112 F.4th at 103 (citing 42 U.S.C. § 1981a(b)(1)). This reasoning finds support in the Supreme Court's holding "that treble damages, while partly punitive, are available against municipalities under the False Claims Act." *Id*. (citing *Cook County, Ill.*, 538 U.S. at 132–33). *Accord Truesdell v. Thomas*, 889 F.3d 719, 724–25 (11th Cir. 2018) (refusing to exempt municipalities from punitive damages made generally available by Driver's Privacy Protection Act); *Cross v. New York City Transit Auth*., 417 F.3d 241, 724–25 (2d Cir. 2005) (declining to exempt municipalities from liquidated damages made generally available by ADEA, even though they are punitive in nature).

Were there any doubt, when Congress amended the FHA in 1988, legislative history suggests "it was well aware that the statute reached municipal defendants." *Gilead Cmty. Servs., Inc.*, 112 F.4th at 104 (citing H.R. Rep. No. 100-711 at 24 (1998) ("These new subsections would also apply to state or local . . . laws, regulations, practices, or decisions[.]")). And because it was in 1988 that Congress removed the FHA's $1,000 cap on punitive damages, "[i]t strains credulity to think that Congress intended to prohibit or curtail punitive damages against municipalities *sub silentio* through the very amendment that greatly expanded the availability of those damages." *Id*.

    **b.**    **A punitive damages award of $400,000 is appropriate.**

NRHA's reprehensive conduct, the need for deterrence, and NRHA's sophistication and finances supports an award of $400,000. *First*, NRHA's conduct cannot be explained as anything but malicious or evincing a reckless and wanton disregard for Ms. Mayrant's civil rights. Despite Ms. Mayrant's repeated attempts to resolve this without litigation, NRHA has consistently and

inexplicably failed to implement the rudimentary accommodation. *Id*. NRHA cannot put forth a plausible, good-faith reason for why it neither implemented the accommodation, nor communicated with Ms. Mayrant's counsel, for what is now nearly seven months. The accommodation's reasonableness and necessity is not subject to debate; no investigation into logistics, the law, or the facts was required. And NRHA cannot claim ignorance or lack of experience, or that it lacked actual notice of its ongoing noncompliance. *See infra* at 28–29. For example, it would strain credulity to suggest it lacked knowledge of its FHA obligations: NRHA initially granted the accommodation, and because NRHA is a public housing agency receiving funds from the federal government, its staff are expected to attend HUD-sponsored fair housing trainings. 24 C.F.R. § 115.306(b); *Matarese*, 795 F.Supp.2d at 451.

*Second*, NRHA is a sophisticated entity, subject to federal and state regulations, with a "$100 million annual capital and operating budget[.]" *Id*. ¶ 8 (citations omitted). This award signals to NRHA—and those with comparable resources—that noncompliance cannot be written off as an ordinary business expense. *Third*, the need for deterrence is high. NRHA's callous disregard towards this request for an accommodation, whose necessity and reasonableness is self-evident, exudes disrespect not only for disabled persons, but also for the informal, interactive process Congress envisioned. Were this conduct to be emulated by others, lawsuits—not the interactive process—would become the primary means of resolving these disputes.

        c.        **NRHA is vicariously liable for the punitive damages, and the amount sought does not offend the Due Process Clause.**

NRHA may be held liable for punitive damages because its agents or employees responsible for the constructive denial were "employed in a managerial capacity and w[ere] acting in the scope of employment[.]" *Matarese*, 795 F.Supp.2d at 453 (citing *Kolstad*, 527 U.S. at 542–43)). In granting the accommodation, NRHA's designated *accommodation specialist*, Ms. Rich,

conveyed Ms. Mayrant may raise any issues with her or Ms. Brandon-Hamlin, Ms. Mayrant's then-property manager. NRHA Resp., ECF No 1; LASEV Oct. 8 Email at 2, ECF No. 1-4. Issues did arise, so counsel twice brought NRHA's persistent noncompliance to the attention of Ms. Mayrant's property managers; on one occasion, to the attention of Ms. Rich; and on both occasions to the attention of NRHA attorneys and officials, including Ms. Fleming, NRHA's Director of Property Management. *E.g.* NRHA Resp., ECF No 1; LASEV Oct. 8 Email at 2, ECF No. 1-4; LASEV Oct. 31 Letter at 1–4, ECF No. 1-8. Ms. Rich, Ms. Hamlin, and Ms. Fleming plainly had the authority to address such issues, and their conduct was within their scope of employment. *Matarese*, 795 F.Supp.2d at 454 (citing *Kolstad*, 527 U.S. at 543–44)); *see also id*. at 453 (to be in a "managerial capacity," employee must be important but need not be top management, officer, or director) (citing *Kolstad*, 527 U.S. at 543). Alternatively, "the principal ratified . . . the act." *Id*. at 453 (citing *Kolstad*, 527 U.S. at 542–43). Each communication was issued to the Director of Property Management, for instance. Despite knowing that noncompliance persisted, Ms. Fleming did nothing other than once ask Ms. Rich to reply. LASEV Oct. 31 Letter at 3, ECF No. 1-8. But neither Ms. Rich, nor anyone else, has replied to this day. For this and other reasons, it also cannot be said this conduct was "contrary to the principal's good-faith efforts to comply with the FHA." *Matarese*, 795 F.Supp.2d at 454 (citations omitted); *id*. (no good faith where "corporate office, knowing that [plaintiff's] concerns were being ignored, did nothing to ensure future compliance.").

Finally, a $400,000 punitive damages award does not offend due process. The reprehensibility of NRHA's conduct, *see supra* at 28, which is the "most important" factor, weighs strongly in Ms. Mayrant's favor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Second, the ratio between the compensatory damages ($250,000) and punitive damages ($400,000) is 1.6 to 1. Although the Supreme Court has eschewed any mathematical formula, this ratio is a far cry

from the sort the Court was concerned with. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). Lastly, the disparity between the award sought and those imposed in comparable cases is minimal and, in any event, justified by the low 1.6 to 1 ratio and this sophisticated entity's inexplicable disregard for an accommodation whose reasonableness and necessity needs no explanation. *See, e.g.*, *Davis*, 524 F. Supp. 2d at 1377 ($420,000 punitive award to quadriplegic based on similar reasoning); *Gilead Cmty. Servs., Inc.*, 112 F.4th at 103  (upholding award despite disparity between $2 million punitive award and fines and penalties authorized in HUD administrative enforcement proceedings); *Housing Discrimination Law and Litigation, supra, Relief in § 3613 cases—Punitive damages—Introduction; end of the $1,000 limitation*, § 25:9 n. 6–7 (collecting punitive awards post 1988).

## CONCLUSION

For the reasons stated above, the Motion should be granted.

Dated:  February 5, 2025

> Respectfully submitted,
> **JASMINE MAYRANT**
> By:    /s/ *Brandon L. Ballard*
> Brandon L. Ballard (VSB No.: 95346)
> Melissa B. Bonfiglio (VSB No.: 90016)
> LEGAL AID SOCIETY OF EASTERN VIRGINIA
> 125 St. Paul's Blvd., Suite 400
> Norfolk, VA 23510
> Ph: (757) 648-1241
> Fax: (757) 622-8102
> Email: brandonb@laseva.org
> Email: melissab@laseva.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February 2025, I electronically filed the foregoing using the CM/ECF system, which will then send a notification of such filing to counsel of record.

> By:    /s/ Brandon L. Ballard

30