**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

JASMINE MAYRANT,

             Plaintiff,

v.

NORFOLK REDEVELOPMENT AND
HOUSING AUTHORITY, a political
subdivision of the Commonwealth,

             Defendant.

Civil No.: 2:24-cv-715

## PLAINTIFF JASMINE MAYRANT'S BRIEF IN SUPPORT OF
## REQUEST FOR DAMAGES, ATTORNEY'S FEES, AND COSTS

Plaintiff, Ms. Jasmine Mayrant ("Ms. Mayrant"), by counsel, pursuant to Local Civil Rule 7 and this Court's September 23, 2025, Order (ECF No. 30), hereby files this brief in support of her request for damages, attorney's fees, and costs.

### INTRODUCTION

Ms. Mayrant, a public housing resident at a dwelling unit owned and managed by Norfolk Redevelopment and Housing Authority ("NRHA"), is legally blind. Compl. ¶ 1, ECF No. 1. At the outset of her tenancy in June 2024, she requested that as a result of her disability,[1] NRHA issue all communications and notices to Ms. Mayrant and her attorney by email. *Id*. Having an electronic copy of such documents allows her to magnify them on a computer or phone and read them in differential lighting. *Id*. Shortly after, NRHA formally granted the accommodation. *Id*. ¶ 2.

Despite acknowledging Ms. Mayrant's disability and granting the requested accommodation, NHRA neither "implement[ed] it, nor meaningfully engag[ed] with [the] request,

---

[1] The term "handicapped" under 42 U.S.C. § 3602(h) is synonymous with the term "disabled." *See, e.g.*, *Helen L. v. DiDario*, 46 F.3d 325, 330 n.8 (3d Cir. 1995) (citation omitted).

for approximately one year and counting." *Mayrant v. Norfolk Redevelopment & Hous. Auth.*, No. 2:24-cv-715, ECF No. 30, --- F.Supp.3d ----, 2025 WL 2738859, at *9 (E.D. Va. Sept. 23, 2025). Indeed, even after Ms. Mayrant filed this lawsuit, NRHA "took no action." *Id*. at *11.

On September 23, 2025, this Court granted Ms. Mayrant's Motion for Default Judgment on her failure to accommodate claim (Count I) and issued a permanent injunction. *Id.*at **1, 13. Still pending before the Court is Ms. Mayrant's request for $250,000 in compensatory damages, $400,000 in punitive damages, $23,197.77 in attorney's fees, and $501.50 in costs. *Id*. at *13. Ms. Mayrant acknowledges the "relief requested is significant[.]" *Id*. at *11. Yet as this Court observed, the relief requested is "not harsh when viewed in light of the opportunities presented to [NRHA] to cure the violation." *Id*. Because the evidence and authorities set forth below supports the requests, the Court should enter judgment for the requested relief with the requisite post-judgment interest.

## BACKGROUND

The facts, which are deemed admitted and will form the basis for judgment, are set forth by this Court in its earlier opinion and order. *Mayrant*, 2025 WL 2738859, at **1–4.

A new declaration executed by Ms. Mayrant is attached. Mayrant Decl., ECF No. 31-5. Ms. Mayrant does not re-attach evidence that already is before the Court. *See, e.g.*, Mayrant Decl., ECF 11-2; Mayrant Decl.; Second Notice of Supplementary Evidence, ECF No. 26-1; Mayrant Decl., ECF No. 26-2; First Notice of Supplementary Evidence, ECF No. 22; *id*. at ECF No. 22-1 through 22-5. Where relevant, she will refer to that evidence throughout this brief.

With respect to attorney's fees and costs, Ms. Mayrant attaches the following as evidence: (1) a declaration executed by Brandon L. Ballard, Esq., including (a) Exhibit A, which are contemporaneous time records produced by the Legal Aid Society of Eastern Virginia's ("LASEV") case management software, "Kemp's Case Works" ("Kemps"), and (b) Exhibit B,

which is an Excel spreadsheet, showing the same, unmodified time records from Kemps in an excel spreadsheet, *see* Ballard Decl., ECF No. 31-1; (2) a declaration executed by Melissa Bonfiglio, Esq., *see* ECF No. 31-2; (3) a declaration executed by Helen Hardiman, Esq., a civil rights attorney and founder of the Richmond-based law firm Hardiman Law PLLC, *see* Hardiman Decl., ECF No. 31-3[2]; (4) a declaration executed by Ms. Megan Marmottin, an employee at LASEV who explains how she imported the data from Kemps and Excel, *see* Marmottin Decl., ECF No. 31-4; and (5) the service of process invoices, *see* ECF No. 31-6. Counsel provided the excel spreadsheet because the Kemps time records do not show the entire description of the task performed for entries that are of a certain length. Ballard Decl. ¶ 8, ECF No. 31-1; Marmottin Decl. ¶ 4, ECF No. 31-4.

## ARGUMENT

**I.    The Court should award Ms. Mayrant compensatory and punitive damages.**

The Fair Housing Act ("FHA") authorizes compensatory and punitive damages. 42 U.S.C. § 3613(c)(1). Entities like NRHA may be held vicariously liable for its agents' discriminatory acts. *E.g. Meyer v. Holley*, 537 U.S. 280, 282 (2003); *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 102 (2d Cir. 2024); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733–34 (E.D. Va. 1992).

**A.    An award of $250,000 in compensatory damages is appropriate.**

Because Ms. Mayrant does not seek pecuniary damages, she begins by providing an overview of the legal landscape for emotional distress awards. Emotional distress damages caused by a defendant's discriminatory housing practices are recoverable. *E.g. Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 445 (E.D. Va. 2011) (citing *Banai v. Sec'y, U.S. Dep't of*

---

[2] Ms. Hardiman was not, and will not be, compensated for preparing the declaration. Hardiman Decl. ¶ 14, ECF No. 31-3.

*Hous. & Urb. Dev. on Behalf of Times*, 102 F.3d 1203, 1207 (11th Cir. 1997) and *United States v. Balistrieri*, 981 F.2d 916, 931 (7th Cir. 1992)). Emotional distress may be "inferred from the circumstances as well as proved by the testimony." *Id*. at 446 (citing *Marable v. Walker*, 704 F.2d 1219, 1220–21 (11th Cir. 1983)). A plaintiff's non-conclusory testimony, "standing alone, can support" such awards. *Bryant v. Aiken Reg'l Med. Centers Inc*., 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)). Although such testimony must specify "how [the] alleged distress manifested itself," *id*. at 547 (citation and internal quotation marks omitted), the plaintiff "need not prove the exact measurement of damages for the harm suffered." *Matarese*, 795 F.Supp.2d at 446 (citing *Marable*, 704 F.2d at 1220–21). Nor is proof that a plaintiff sought medical or psychological attention necessary. *See, e.g.*, *id*. at 448. For example, in *Bryant* the Fourth Circuit found that a plaintiff's testimony was non-conclusory where she testified she was "embarrassed, frustrated, and angry," "very disgusted," that she "didn't feel very good about coming to work," and expressed the specific physical ailments caused by the discrimination. *Bryant*, 333 F.3d at 547 (cleaned up). As such, the Court upheld the emotional-distress award of $50,000 (in today's dollars, $88,132.75). *Id*.[3] The Fourth Circuit similarly upheld the *Matarese* court's $51,000 emotional-distress award and $100,000 punitive damages award (in today's dollars, respectively, $72,895.14 and $142,931.64), which was similarly based solely upon non-conclusory lay witness testimony. *Matarese v. Archstone Communities, LLC*, 468 F. App'x 283, 284 (4th Cir. 2012) (affirming damages awards but vacating injunction that ordered landlord to simply "follow the law[.]").

---

[3] All inflation calculations are reached using the online calculator provided by the U.S. Bureau of Labor Statistics. *See* https://www.bls.gov/data/inflation_calculator.htm.

The factfinder may consider many factors, including but not limited to the degree of emotional distress, the context of the events surrounding it, and any mitigating circumstances. *Price*, 93 F.3d 1241 at 1254  (citations omitted); *see also HUD v. Wilson et. al.*, No. HUD ALJ 03-98-0692-8, 2000 WL 988268, at *19 (July 19, 2000) ("Damages for emotional distress may be based on inferences drawn from the circumstances of the case, as well as on testimonial proof." (collecting cases at n.5)). And the factfinder's determination will not be reversed absent an abuse of discretion. *See Hicks v. Ferreyra*, 64 F.4th 156, 162, 175–65 (4th Cir. 2023) (in *Bivens* case, finding no abuse of discretion and affirming $205,000 emotional-distress award and $525,000 punitive award, even though there was no medical testimony, economic loss, or physical injury), *cert. denied*, 144 S. Ct. 555 (2024); *see also Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 507 (4th Cir. 2007) (approving emotional-distress award of $150,000 based upon lay witness testimony alone in consumer protection case).

Here, the degree of emotional distress, the context of the events surrounding it, and the lack of any mitigating circumstances support the compensatory damages sought. *Price*, 93 F.3d 1241 at 1254 (citations omitted). The harms wrought by NRHA's brazen disregard for Ms. Mayrant's rights have been compounded by her preexisting physical and mental state. *See, e.g.*, *Bryant*, 333 F.3d at 547 (considering characteristics of the plaintiff's background to provide context to the manner in which the plaintiff responded to the discrimination, namely, why she didn't seek counseling, and the effects it had on her);  Robert G. Schwemm, *Relief in § 3613 cases— Evaluating intangible injuries*, Housing Discrimination Law and Litigation § 25:6 (Westlaw database last updated July 2025) ["*Housing Discrimination Law and Litigation*"] (noting that courts have recognized that some "are simply more affected by being discriminated against than others." (footnote omitted)).

Ms. Mayrant tries her best to be independent and a role model for her children and other disabled persons. Mayrant Decl. ¶¶ 10–12, 14, ECF No. 11-2. But her life has been extremely challenging. She is diagnosed with post-traumatic stress disorder, anxiety, depression, and insomnia. Mayrant Decl. ¶ 7, ECF No. 11-2; Compl. ¶ 27, ECF No. 1. She is also a survivor of domestic violence. *Id*. At times, she becomes so anxious and stressed that it manifests as physical pain, rendering her immobile and in need of her wheelchair. Mayrant Decl. ¶ 7, ECF No. 11-2. Such incidents began following a 2018 car accident in which she "wrecked her back/legs[.]" *Id*. She has a chronic history of homelessness and living in unsafe conditions. *Id*. ¶ 10. And she believes many do not perceive how difficult it is for visually impaired persons to complete daily and important tasks. *Id*. ¶ 11. Because it is still common for people and entities to convey important and general information through physical documents in regular-sized font, she finds herself having to request accommodations. *Id*. ¶ 11. But doing so is a frequent cause for embarrassment, anxiety, and sometimes humiliation, as she does not want people to view her as "less than them[.]" *Id*. *See also* Mayrant Decl. ¶¶ 3–7, ECF No. 31-5.

Given Ms. Mayrant's traumatic background, history of homelessness, and difficulty with requesting accommodations in the past, she was relieved "when [her] name was finally pulled from the NRHA waitlist" for public housing. Mayrant Decl. ¶ 7, ECF No. 31-5. She thought it was "finally a chance for [her] and [her] children to have stability." *Id*. Immediately, though, she was worried about missing important information. *Id*. ¶¶ 8–9. Ms. Mayrant was thus relieved to learn of NRHA's apparent willingness to accommodate her. Mayrant Decl. ¶ 10, ECF No. 11-2.

Ms. Mayrant's relief, however, was soon tampered by the realization that NRHA would inexplicably persist in refusing to implement the accommodation. *Id*. ¶ 13. This has, and continues to, severely exacerbate Ms. Mayrant's already fragile physical and mental state. At first, she tried

to ignore it, thinking NRHA would eventually do the right thing. *Id*. ¶ 14. But as time went on, Ms. Mayrant has grown more anxious and loses sleep over whether she will miss something important that causes her to lose her home. *Id*. ¶¶ 17–18. Sometimes she breaks down into tears as a result of NRHA's seeming refusal to comply with her accommodation. *Id*. ¶ 19. At times, she has "PTSD moments and flashbacks" to when she and her children were homeless, worrying that NRHA's conduct will cause her to be homeless again. *Id*. ¶¶ 17–18. *See also id*. ¶ 10. As a survivor of domestic violence, she remains terrified that someone (especially a male) will unexpectedly walk in her unit to conduct an inspection she was unaware of. *Id*. ¶ 15. Ms. Mayrant's depression symptoms have risen as a result of this ordeal. *See id*. ¶¶ 19, 21–22. And the occasions on which Ms. Mayrant is physically immobile from anxiety and stress have increased. *Id*. ¶¶ 7, 14, 22. Overall, she has found this entire process "embarrassing and humiliating," as she feels as if "NRHA is intentionally disrespecting [her] rights as a disabled person[.]" *Id*. ¶¶ 14; *see also id*. ¶ 20. She has "so many other stressful things going on in [her] life," and this ordeal continues to significantly impair her physical and mental state. *See id*. ¶ 22.

Remarkably, as this Court observed, NRHA continued to disregard Ms. Mayrant's accommodation even after this lawsuit was filed. As Ms. Mayrant observes, "[t]he thought of losing [her] housing and [] children [as a result of NRHA's misconduct] has preoccupied [her]." Mayrant Decl. ¶ 10, ECF No. 31-5. Her sleep and appetite continue to be "affected"; she is "consumed with anxiety," which exacerbates "the pain in [her] back and legs[.]" *Id*. *See also id*,. ¶ 10 (stating she continues to "lose sleep and cry over whether [she] might lose [her] housing[.]"). Unfortunately, as a result of NRHA's continuous disregard for her rights, she has "never felt comfortable in [her] home[.]" *Id*. The whole experience, pre- and post-lawsuit, has made her "sad, anxious, depressed, nervous and embarrassed." *Id*.

At this juncture, it is plausible that NRHA will seize on the fact that Ms. Mayrant's testimony is not supported by the testimony of others, such as family, friends, or medical professionals. First and foremost, as stated above, such evidence is not required in these cases. More importantly, every case must be evaluated on its own facts. Here, Ms. Mayrant explains that given her traumatic background, including the fact that she spent over two years going to court for a CPS case, she is "afraid to talk about this [case] with anyone," as she fears it will be "used against [her]." *Id.* Moreover, Ms. Mayrant doesn't have family or close friends who she trusts. *Id.* She never lived with her father, and her mother's parental rights were terminated when she was 15. *Id.* Instead, she grew up in foster care and in group homes. *Id.* And although Ms. Mayrant receives counseling, she is reluctant to disclose much of her life to anyone. *Accord Bryant*, 333 F.3d at 547 (considering characteristics of the plaintiff's background to provide context to the manner in which the plaintiff responded to the discrimination, namely, why she didn't seek counseling, and the effects it had on her). In any event, Ms. Mayrant is more than willing to allow the Court to assess her credibility if the Court believes a hearing would aid its decisional process.

One final note. Courts also consult awards in other civil rights cases. *E.g. Matarese*, 795 F.Supp.2d at 448–49. While this is inherently a case-by-case inquiry, several courts have observed that "garden variety" emotional distress claims—that is, those "devoid of any medical treatment or physical manifestation," *Parris v. Pappas*, 844 F. Supp. 2d 271, 279 n.9 (D. Conn. 2012) (citations omitted)—"generally merit $30,000 to $125,000 awards." *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (cleaned up) (collecting cases as far back as 2005); *see also* Armen H. Merjian, *Nothing "Garden Variety" About It: Manifest Error and Gross Devaluation in the Assessment of Emotional Distress Damages*, 70 SYRACUSE L. REV. 689, 691 (2020) ("Indeed, following the Second Circuit's lead, courts have repeatedly affirmed a range of $30,000 to

$125,000 [for so-called "garden variety" claims], a range that, as this article demonstrates, must now be adjusted upwards for accuracy and inflation.").

Even so, as just stated, each case must be evaluated on its own facts, as evinced by the fact that courts have approved much higher emotional distress awards based upon lay testimony alone. *See, e.g.*, *Sanzaro v. Ardiente Homeowners Ass'n, LLC*, 364 F. Supp. 3d 1158, 1181–82 (D. Nev. 2019) (awarding $350,000 to married couple for emotional distress based solely on lay testimony in FHA disability-service animal case), *appeal dismissed*, 2020 WL 1670273 (9th Cir. 2020); *Fischer v. United Parcel Serv., Inc.*, 390 F. App'x 465, 472 (6th Cir. 2010) (affirming verdict for $650,000 in emotional distress damages in Title VII discrimination case, notwithstanding fact that evidence solely consisted of plaintiff's testimony and plaintiff failed to seek medical treatment); *Broome v. Biondi*, 17 F.Supp. 2d 211, 225–26 (S.D.N.Y. 1997) (in FHA case, where landlord denied tenants' application based on race, affirming jury award of $114,000, largely for emotional distress (over $230,000 in today's dollars), based upon plaintiffs' non-conclusory testimony).

One court, for instance, entered a default judgment for a quadriplegic in the amount of $420,000 in emotional distress damages; no medical evidence was presented, but the FHA plaintiff testified that for seven months, he lacked access to an elevator and thus had to crawl up and down the stairs. *Davis v. Lane Mgmt.*, LLC, 524 F. Supp. 2d 1375, 1376–77 (S.D. Fla. 2007). In justifying the compensatory award (and a punitive award of the same amount), the Court remarked that the sophisticated entity ignored plaintiff's requests to make financially feasible elevator repairs for months. *Id*. at 1378. Further, "[t]hat quadriplegics require elevators to ascend and descend stories need[ed] no explanation." *Id*. While not entirely comparable to the quadriplegic's physical plights, Ms. Mayrant has increasingly experienced bouts of immobility on account of anxiety, and has provided extensive non-conclusory testimony about how her emotional distress

manifested itself. Mayrant Decl. ¶¶ 7, 14, 22, ECF No. 11-2. As in *Davis*, this emotional distress was caused by NRHA's inexplicable refusal to implement an accommodation whose necessity and reasonableness is self-evident.

For all these reasons, an award of $250,000 in compensatory damages is reasonable under the peculiar facts of this case.

**B.     An award of $400,000 in punitive damages is appropriate and justified.**

Punitive damages are appropriate when the defendant's conduct is malicious or evidences a reckless indifference to others' federally-protected rights. *E.g. Quigley v. Winter*, 598 F.3d 938, 952–53 (8th Cir. 2010) (cleaned up) (in FHA case, upholding $250,000 punitive award). Reckless indifference is shown if a defendant "'discriminate[s] in the face of a perceived risk that [his] actions will violate federal law[.]'" *Id.* at 953 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). There is no legal impediment to the award sought here, and the amount is justified by the great need for deterrence, along with NRHA's egregious conduct, sophistication, and finances.

**a.     Punitive damages are available against municipalities under the FHA.**

District courts are divided over whether punitive damages are authorized against a municipality or, as here, a political subdivision thereof. *E.g. Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 86 n.21 (D. Conn. 2019) (collecting cases). The Second Circuit— the only circuit to have addressed this question—recently examined the FHA's text, statutory history, and legislative history and concluded the FHA allows punitive awards against municipalities and, by extension, their instrumentalities. *Gilead Cmty. Servs., Inc.*, 112 F.4th at 102–04 (upholding $2 million punitive award against town). The Court should adopt the Second's Circuit's reasoning, which is far more persuasive than the district court decisions to the contrary. *E.g.* Robert G. Schwemm, *Gilead: Municipal Liability for Punitive Damages Under the Fair Housing Act*, 57 CONN. L. REV. 1053, 1069 (2025) (observing that most district courts who

declined to impose punitive damages on municipalities "did not engage in any real analysis of the FHA's text or legislative history," which is distinct from Section 1983's.

Unlike 42 U.S.C. § 1983, which does not expressly authorize punitive damages, *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (holding punitive damages are unavailable against municipalities under Section 1983), 42 U.S.C. § 3613(c)(1)'s "text easily and unequivocally rebuts the common-law presumption" against the availability of punitive damages from municipalities. *Gilead Cmty. Servs., Inc.*, 112 F.4th at 103. Although the statute does not specifically say punitive damages are available against *municipalities*, Congress need not "speak with such granular detail on the issue." *Id.*; *id.* at 103–04. Yet in one respect, the statute *does* speak with such granular detail. The statute refers to the "person against whom" a discriminatory housing practice is alleged in a private suit, 42 U.S.C. § 3613(b), and defines "person" broadly to include corporations. *Id.* at 101 (citing 42 U.S.C. § 3602(d)). *See also Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 126 (2003) (discussing understanding of municipalities as corporations "going back at least to Coke."). In any event, when Congress desired to exempt local governments from generally applicable remedies, "it has said so clearly." *Gilead Cmty. Servs., Inc.*, 112 F.4th at 103 (citing 42 U.S.C. § 1981a(b)(1)). This reasoning finds support in the Supreme Court's holding "that treble damages, while partly punitive, are available against municipalities under the False Claims Act." *Id.* (citing *Cook County, Ill.*, 538 U.S. at 132–33). *Accord Truesdell v. Thomas*, 889 F.3d 719, 724–25 (11th Cir. 2018) (refusing to exempt municipalities from punitive damages made generally available by Driver's Privacy Protection Act); *Cross v. New York City Transit Auth.*, 417 F.3d 241, 724–25 (2d Cir. 2005) (declining to exempt municipalities from liquidated damages made generally available by ADEA, even though they are punitive in nature).

Were there any doubt, when Congress amended the FHA in 1988, legislative history suggests "it was well aware that the statute reached municipal defendants." *Gilead Cmty. Servs., Inc.*, 112 F.4th at 104 (citing H.R. Rep. No. 100-711 at 24 (1998) ("These new subsections would also apply to state or local . . . laws, regulations, practices, or decisions[.]")). And because it was in 1988 that Congress removed the FHA's $1,000 cap on punitive damages, "[i]t strains credulity to think that Congress intended to prohibit or curtail punitive damages against municipalities *sub silentio* through the very amendment that greatly expanded the availability of those damages." *Id*.

**b.    A punitive damages award of $400,000 is appropriate.**

NRHA's reprehensible conduct, the need for deterrence, and NRHA's sophistication and finances supports an award of $400,000. *First*, NRHA's conduct cannot be explained as anything but malicious or evincing a reckless and wanton disregard for Ms. Mayrant's civil rights. Despite Ms. Mayrant's repeated attempts to resolve this without litigation, NRHA has consistently and inexplicably failed to implement the rudimentary accommodation. *Id*. NRHA cannot put forth a plausible, good-faith reason for why it neither "implement[ed] it, nor meaningfully engag[ed] with [the] request, for approximately one year and counting." *Mayrant*, 2025 WL 2738859, at *9. Indeed, as shown by not one—but *two*—notices of supplementary evidence, NRHA still "took no action" after this lawsuit was filed. *Id*. at *11. The accommodation's reasonableness and necessity is not subject to debate; no investigation into logistics, the law, or the facts was required. And NRHA cannot claim ignorance or lack of experience, or that it lacked actual notice of its ongoing noncompliance. *See infra*. For example, it would strain credulity to suggest it lacked knowledge of its FHA obligations: NRHA initially granted the accommodation, and because NRHA is a public housing agency receiving funds from the federal government, its staff are expected to attend HUD-sponsored fair housing trainings. 24 C.F.R. § 115.306(b); *see also, e.g.*, *Matarese*, 795 F.Supp.2d at 451.

*Second*, NRHA is a sophisticated entity, subject to federal and state regulations, with a "$100 million annual capital and operating budget[.]" *Id.* ¶ 8 (citations omitted). And NRHA itself acknowledges it is a national leader in real estate development and property management. *Id.* For those reasons, NRHA's conduct is especially inexcusable. This award thus signals to NRHA—and those with comparable resources—that noncompliance cannot be written off as an ordinary business expense.

*Third*, the need for deterrence is high. NRHA's callous disregard towards this request for a simple accommodation, whose necessity and reasonableness is self-evident, exudes disrespect not only for disabled persons, but also for the informal, interactive process Congress envisioned. Were this conduct to be emulated by others, lawsuits—not the interactive process—would become the primary means of resolving these disputes. Counsel tried to avoid litigation, but evidently NRHA believed, for whatever reason, it didn't need to even engage with counsel's good-faith efforts to bring it into compliance.[4]

### c. NRHA is vicariously liable for the punitive damages, and the amount sought does not offend the Due Process Clause.

NRHA may be held liable for punitive damages because its agents or employees responsible for the constructive denial were "employed in a managerial capacity and w[ere] acting in the scope of employment[.]" *Matarese*, 795 F.Supp.2d at 453 (citing *Kolstad*, 527 U.S. at 542–43)). In granting the accommodation, NRHA's designated *accommodation specialist*, Ms. Rich, conveyed that Ms. Mayrant may raise any issues with her or Ms. Brandon-Hamlin, Ms. Mayrant's then-property manager. NRHA Resp., ECF No 1; LASEV Oct. 8 Email at 2, ECF No. 1-4. Issues

---

[4] Following the Court's issuance of a permanent injunction, NRHA appears to finally be providing all communications and notices to Ms. Mayrant and counsel by email. This is a welcome development. But it shouldn't have taken the Court's intervention for it to take its obligations under the FHA seriously. And the Court must not forget that even the filing of this lawsuit wasn't evidently sufficient to bring NRHA into full compliance; it took a court order for that to happen.

did arise, so counsel twice brought NRHA's persistent noncompliance to the attention of Ms. Mayrant's property managers; on one occasion, to the attention of Ms. Rich; and on both occasions to the attention of NRHA attorneys and officials, including Ms. Fleming, NRHA's Director of Property Management. *E.g.* NRHA Resp., ECF No 1; LASEV Oct. 8 Email at 2, ECF No. 1-4; LASEV Oct. 31 Letter at 1–4, ECF No. 1-8. Ms. Rich, Ms. Hamlin, and Ms. Fleming plainly had the authority to address such issues, and their conduct was within their scope of employment. *Matarese*, 795 F.Supp.2d at 454 (citing *Kolstad*, 527 U.S. at 543–44)); *see also id*. at 453 (to be in a "managerial capacity," employee must be important but need not be top management, officer, or director) (citing *Kolstad*, 527 U.S. at 543). Alternatively, "the principal ratified . . . the act." *Id*. at 453 (citing *Kolstad*, 527 U.S. at 542–43). Each communication was issued to the Director of Property Management, for instance. Despite knowing that noncompliance persisted, Ms. Fleming did nothing other than once ask Ms. Rich to reply. LASEV Oct. 31 Letter at 3, ECF No. 1-8. But neither Ms. Rich, nor anyone else, replied. For this and other reasons, it also cannot be said this conduct was "contrary to the principal's good-faith efforts to comply with the FHA." *Matarese*, 795 F.Supp.2d at 454 (citations omitted); *id*. (no good faith where "corporate office, knowing that [plaintiff's] concerns were being ignored, did nothing to ensure future compliance.").

Moreover, though not required, it is clear that NRHA's Executive Director must now be viewed as ratifying this conduct. As this Court already observed, an email chain "underscores that high-ranking NRHA officials, including its Executive Director, had actual or constructive notice of this lawsuit . . . as early as December 18, 2024[.]" *Id*. at *7. Notwithstanding that actual or constructive knowledge, NRHA *continued* to not comply with the accommodation request, as shown by the two notices of supplementary evidence. Thus, NRHA's Executive Director plainly

did nothing to ensure NRHA was brought into compliance with the accommodation request, and he therefore must be viewed as at least ratifying the noncompliance.

Finally, a $400,000 punitive damages award does not offend due process. The reprehensibility of NRHA's conduct, *see supra*, which is the "most important" factor, weighs strongly in Ms. Mayrant's favor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Second, the ratio between the compensatory damages ($250,000) and punitive damages ($400,000) is 1.6 to 1. Although the Supreme Court has eschewed any mathematical formula, this ratio is a far cry from the sort the Court was concerned with. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

Lastly, the disparity between the award sought and those imposed in comparable cases is minimal and, in any event, justified by both the low 1.6 to 1 ratio and this sophisticated entity's inexplicable disregard for a simple accommodation whose reasonableness and necessity needs no explanation. *See, e.g.*, *Davis*, 524 F. Supp. 2d at 1377 ($420,000 punitive award to quadriplegic based on similar reasoning); *Gilead Cmty. Servs., Inc.*, 112 F.4th at 103 (upholding award despite disparity between $2 million punitive award and fines and penalties authorized in HUD administrative enforcement proceedings); *Sanzaro*, 364 F. Supp. 3d at 1182–83 (awarding $285,000 in punitive damages as defendants acted with reckless indifference to the rights of disabled individuals seeking reasonable accommodations); *Housing Discrimination Law and Litigation*, *supra*, *Relief in § 3613 cases—Punitive damages—Introduction; end of the $1,000 limitation*, § 25:9 n. 6–7 (collecting punitive awards post 1988).

II.    **Ms. Mayrant is entitled to her costs and attorneys' fees, and the amounts requested are reasonable.**

"[E]ntities providing pro bono representation may receive attorney's fees where appropriate, even though they did not expect payment from the client and, in some cases, received public funding." *Brinn v. Tidewater Transp. Dist. Comm'n*, 242 F.3d 227, 234–35 (4th Cir. 2001) (collecting cases). Such entities are entitled to the same prevailing rates as attorneys in the private market. *Blum v. Stenson*, 465 U.S. 886, 893–95 (1984) (upholding use of prevailing market rates under 42 U.S.C. § 1988 to calculate fee award to a legal aid society).

Ms. Mayrant therefore turns to whether she is the "prevailing party," as defined by the FHA. She is. In order to encourage enforcement of the FHA, Congress authorized courts to award the "prevailing party . . . a reasonable attorney's fee and costs." 42 U.S.C. § 3613(c)(2). In construing this provision, the Court may consult caselaw interpreting statutes that similarly authorize fee awards to a "prevailing party." *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983).

"A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989). This Court already issued a permanent injunction. That is sufficient to find Ms. Mayrant is a prevailing party. *Lefemine v. Wideman*, 568 U.S. 1, 4–5 (2012). Ms. Mayrant is also entitled to compensatory and punitive damages. This too, affords her prevailing party status, as it modifies NRHA's behavior for Ms. Mayrant's benefit. *Farrar v. Hobby*, 506 U.S. 103, 113 (1992). Absent circumstances that are not at issue here, a prevailing party is generally entitled to recover her fees and costs. *Abdelhalim v. Lewis*, 90 F.4th 265, 271 (4th Cir. 2024) (citing *Christiansburg Garmen Co. v. E.E.O.C.*, 434 U.S. 412, 415 (1978)); *Bills v. Hodges*, 628 F.2d 844, 847 (4th Cir. 1980).

16

**A.      Ms. Mayrant is entitled to $23,197.77 in reasonable attorney's fees.**

The Fourth Circuit has set forth a three-step framework to guide district courts' broad discretion in ascertaining reasonable fee awards. *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013), *as amended* (Jan. 23, 2014). First, the district court must determine the "lodestar amount," that is, it must multiply the reasonable hourly rate by the hours reasonably expended. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008) (citations omitted). The reasonableness of the hours expended and hourly rate sought is arrived at by evaluating twelve factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009) (quoting *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989))). But "the Court need not address all twelve *Johnson* factors independently because many of these considerations are subsumed in the calculation of the hours reasonably expended and the reasonableness of the hourly rate." *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *6 (E.D. Va. Dec. 18, 2020) (cleaned up). Nor is the court under any "obligation to go through the inquiry of those [*Johnson*] factors that do not fit." *In re A.H. Robins Co., Inc.*, 86 F.3d 364, 376 (4th Cir. 1996) (citation omitted).

Second, the court must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *McAfee*, 738 F.3d at 88. Finally, "the court should award some percentage of the

remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id*. (cleaned up). In performing this task, "[w]hat the court must ask is whether the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id*. at 92 (cleaned up).

        **a.**      **The 80.1 hours expended for which compensation is sought are reasonable.**

In determining whether the number of requested hours is reasonable, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). To this end, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id*.; *Courthouse News Serv. v. Schaefer*, 484 F. Supp. 3d 273, 279 (E.D. Va. 2020) ("[I]t is not the function of the courts in reviewing fees to second guess every minute detail of time spent by an attorney in working on a case." (cleaned up)).

Counsel produced true and accurate copies of contemporaneous time records. *See* Ballard Decl., Ex. A–B, ECF No. 31-1. *Accord LoanCare, LLC v. Paymap, Inc.*, 2022 WL 22902718, at *4 (E.D. Va. Mar. 1, 2022) (citation omitted). It is supplemented by an Excel spreadsheet because Kemps, the case management software LASEV utilizes, does not show the entire description of a task performed for entries of a certain length. Ballard Decl. ¶ 8, ECF No. 31-1; Marmottin Decl. ¶ 4, ECF No. 31-4; Bonfiglio Decl. ¶ 8, ECF No. 31-2. No modifications, whatsoever, were made to the Excel spreadsheet and both are provided to demonstrate that fact. *Id*.

In calculating the number of hours reasonably expended, counsel voluntarily excluded various entries. *See Hensley*, 461 U.S. at 434 (noting that attorneys are expected to exercise voluntary "billing judgment," excluding from a fee request "hours that are excessive, redundant,

or otherwise unnecessary[.]").[5] First, there are five entries, totaling 4.4 hours, for which no description of the tasks are provided. Rather than make an educated guess as to what those tasks were, counsel excluded those hours. *See* Ballard Decl. ¶ 30(a), ECF No. 31-1. Second, certain entries are lumped with purely administrative or clerical tasks. *See* Ballard Decl. ¶ 30(b), ECF No. 31-1. Of course, such tasks are not compensable, regardless of who performs them. *Abusamhadaneh v. Taylor*, No. 1:11-cv-939, 2013 WL 193778, at *38 (E.D. Va. Jan. 17, 2013) (citing *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n. 10 (1989). In counsel's view, the total 15% voluntary reduction to the final lodestar figure, *see infra*, at 27–28, ensures NRHA is not charged for such overhead expenses. *See* Ballard Decl. ¶ 30(b), ECF No. 31-1. *Cf. Lamonaca v. Tread Corp.*, 157 F. Supp. 3d 507, 520–21 (W.D. Va. 2016) (reducing *hours expended* by percentage amount due in part to time spent on clerical tasks). Third, counsel voluntarily excludes entries, totaling 11.8 hours, that (a) are not directly related to the central dispute in this case, or (b) provide an arguably vague description of the tasks performed. *See* Ballard Decl. ¶ 30(c), ECF No. 31-1. Given Ms. Bonfiglio's prolonged professional relationship with Ms. Mayrant, some of those communications concerned topics that are both related and unrelated to this action. *Id.* Nevertheless, counsel elected to err on the side of caution by excluding them.

Applying the foregoing, counsel seeks compensation for 80.1 hours. That represents a voluntary cut of 16.2 hours. *See generally* Ballard Decl. ¶ 31, ECF No. 31-1. The remaining tasks for which counsel seeks compensation are appropriately documented and reasonably expended on the object of this litigation. Helen Hardiman, Esq., a civil-rights attorney with substantial experience in FHA and disability rights matters, reviewed the time records and pleadings and

---

[5] The specific entries excluded are noted in Mr. Ballard's declaration. *See* ECF No. 31-1.

similarly concludes that the hours for which compensation is sought are reasonable. *See* Hardiman Decl. ¶¶ 3, 13, ECF No. 31-3.

Moreover, Mr. Ballard's declaration breaks down the hours expended on each major task during the course of this litigation. *See* Ballard Decl. ¶ 32(a)–(i), ECF No. 31-1. In counsel's view, this underscores the reasonableness of the hours expended, and demonstrates the case was handled in an efficient manner. As to the latter, the majority of the time expended on legal research and drafting briefs and pleadings was done by Mr. Ballard, who bills at a lower hourly rate. Ms. Bonfiglio largely reviewed, revised, and provided feedback on the briefs and pleadings. Neither attorney duplicated the other's work. *See generally id*. ¶¶ 11, 32; Bonfiglio Decl. ¶ 22(c), ECF No. 31-2. With respect to the former, notwithstanding this case's nascent procedural posture, NRHA's default caused Ms. Mayrant to "suffer[] increased litigation costs[.]" *Mayrant*, 2025 WL 2738859, at *8. Apart from NRHA's default, NRHA "continue[d] to violate Plaintiff's rights, despite the pendency of this lawsuit." *Id*. at *11. This ongoing disregard for Ms. Mayrant's rights necessitated further communications between Ms. Mayrant and counsel, and the drafting and filing of two motions to supplement the record.

NRHA may plausibly lodge two objections at this juncture, but neither would be persuasive. First, to the extent any entries concern tasks like factual investigation or the drafting of correspondence, the Supreme Court and Fourth Circuit have "upheld compensation at the full attorney rate" for such tasks, as they fall within a "gray area" of tasks which may be performed by an attorney or paralegal. *Jenkins*, 491 U.S. at 288 n.10 (second quote); *Abusamhadaneh*, 2013 WL 193778, at *38 (first quote) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1401–02 (4th Cir. 1987)). This is all the more important for legal aid organizations, who do not have the same luxury as firms do in choosing to deploy associates or paralegals into the fray. *See Isabel v. City of Memphis*, 404

F.3d 404, 416 (6th Cir. 2005) (rejecting argument that hourly rate should be reduced because several tasks could've been performed at lower hourly rate, where counsel was sole practitioner who didn't employ paralegals or support staff). Take LASEV as an example. Besides one attorney who, at times, handles social security matters in federal court, Ms. Bonfiglio and Mr. Ballard are currently the only attorneys who litigate in federal court with some frequency. Ballard Decl. ¶ 17, ECF No. 31-1; Bonfiglio Decl. ¶ 13, ECF No. 31-2. Nor do they employ paralegals or support staff that are trained to help them in such matters. *Id*.

Second, Ms. Bonfiglio was the primary point of contact with Ms. Mayrant. In other contexts, a downward adjustment may be warranted where such tasks were done largely by a lawyer with her experience. Here, however, Ms. Bonfiglio has known and represented Ms. Mayrant in various matters for several years. *See* Bonfiglio Decl. ¶ 22(b), ECF No. 31-2. Given Ms. Mayrant's traumatic history, she is reluctant to trust people. *Id*.; *see also, e.g.*, Mayrant Decl. ¶ 10, ECF No. 31-5. This made Ms. Bonfiglio suitable to be the primary point of contact with Ms. Mayrant. *See Crump v. United States Dep't of Navy by & through Mabus*, 245 F. Supp. 3d 692, 705 (E.D. Va. 2017) (evaluating this factor in the context of ascertaining a reasonably hourly rate, and observing that "counsel had a longstanding relationship with Plaintiff beginning during the course of her efforts to seek a reasonable accommodation before suit was filed[.]"); *Bowe v. Colgate-Palmolive Co*., 443 F. Supp. 696, 721 (S.D. Ind. 1977) (noting the nature and length of the professional relationship factor is "addressed to past dealing[.]"). This factor also supports Ms. Bonfiglio's hourly rate. *See infra*, at 26. In any event, to the extent the Court is inclined to think otherwise, the downward adjustment to the final lodestar figure, *see infra*, at 27–28, is more than sufficient to offset any concerns.

**b.      The hourly rates of $315 for Mr. Ballard and $415 for Ms. Bonfiglio are reasonable.**

In ascertaining the hourly rate, courts must treat "private firms and nonprofit legal service organizations . . . equally[.]" *Buffington v. Baltimore Cnty., Md.*, 913 F.2d 113, 129 (4th Cir. 1990). More broadly, the reasonableness of the hourly rate should be guided by "satisfactory evidence— in addition to the attorney's own affidavits—that the requested rates are line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 896 n.11; *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007) (cleaned up). The relevant community is ordinarily the district in which the case was litigated. *See Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (citation omitted); *Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 710–13 (E.D. Va. 2012) (defining the local community as the Eastern District of Virginia). Permissible evidence includes "affidavits from disinterested counsel, evidence of awards in similar cases, or other specific evidence that allows the court to determine 'actual rates which counsel can command in the market.'" *Long*, 887 F. Supp. 2d at 710 (quoting *Spell*, 824 F.2d at 1402).

Because this action arises under the FHA, the prevailing market rate should be determined, if possible, with reference to the local rates charged by attorneys in FHA cases specifically or civil rights cases generally. *Id.* at 129–30. That said, while the comparator cases from which hourly rates are drawn must be similar, they need not be legally and factual identical. "[I]t would be far too demanding to require the fee applicant to produce evidence of fee awards in *substantially identical* cases, or to restrict the relevant market to cases that present the *same* facts or questions of law." *McAfee v. Boczar*, 906 F. Supp. 2d 484, 496 (E.D. Va. 2012) (emphasis added), *vacated and remanded on other grounds*, 738 F.3d 81 (4th Cir. 2013) (upholding hourly rates under abuse of discretion standard, but finding a reduction to total warranted), *as amended* (Jan. 23, 2014).

To begin, the hourly rates requested by Mr. Ballard ($315) and Ms. Bonfiglio ($415) are supported by the declaration executed by Helen Hardiman. Ms. Hardiman is a civil rights attorney whose practice has focused on fair housing and disability rights litigation and policy for over a decade. Hardiman Decl. ¶ 3, ECF No. 31-3. Prior to starting her own firm in Richmond, Virginia, which focuses on preventing and remedying housing discrimination, Ms. Hardiman served in the Office of Fair Housing Enforcement and Compliance in the U.S. Department of Housing and Urban Development. *Id*. ¶ 3(a)–(b). Before that role, she was an Assistant Attorney General and Policy Advisor in Virginia's Office of Civil Rights, where she served as counsel to the Virginia Real Estate Board and Virginia Fair Housing Board in Richmond, Virginia. *Id*.(c). Prior to that experience, she was a solo practitioner focused on FHA matters and the Vice President of Law & Policy at Housing Opportunities Made Equal of Virginia, Inc. ("HOME"). *Id*.(a),(d). In all, Ms. Hardiman has worked on an estimated 50 reasonable accommodation cases around the country. *Id*. ¶ 4. She is often retained to provide fair housing trainings and seminars for a variety of audiences, including attorneys, civil rights officials, and members of the housing industry. *Id*. ¶ 5. Among other accomplishments, Ms. Hardiman co-authored the second edition of West Academic's casebook, *Experiencing Housing Law* (2021 –2022), and was the managing editor on LexisNexis's forthcoming treatise, *Civil Rights and Strategy Series: Housing Discrimination*. *Id*. ¶¶ 7–8. *See also id*. ¶¶ 8 –10 (listing other accolades).

Based upon Ms. Hardiman's wealth of experience, and her familiarity with counsel, she concludes that the requested hourly rates "seem reasonable and [] in line with other attorneys in the Eastern District of Virginia." *Id*. ¶¶ 12–13. Mr. Ballard and Ms. Bonfiglio similarly submit that their experience, reputation, and abilities support their hourly rates. *See* Ballard Decl. ¶¶ 9–28, ECF No. 31-1; Bonfiglio Decl. ¶¶ 9–20, ECF No. 31-2.

Further, the hourly rates are supported by those found to be reasonable in other cases in this district. Counsel was unable to locate a recent FHA case on Westlaw from this district that addressed the reasonableness of an attorney's fees award and costs. The most recent case appears to be from 1982. *Espinoza v. Hillwood Square Mut. Ass'n*, 532 F. Supp. 440, 449 (E.D. Va. 1982). Candidly, counsel located a failure-to-accommodate case that arose in the employment context in 2017, in which Judge Davis approved the attorneys' *requested* hourly rates of $235 for an associate with six years of experience, and $315 for a senior associate with nineteen years of experience. *Crump*, 245 F. Supp. 3d at 703, 707. In counsel's view, those hourly rates from 2017 are on the low range of what is reasonable in this district. First and foremost, Judge Davis understandably did not *sua sponte* consider whether higher hourly rates than those requested could be reasonable. In addition, some of the cases Judge Davis surveyed support the hourly rates sought here. *Id*. at 707 n.7 (collecting cases, including *Taylor v. Republic Servs., Inc.*, No. 1:12-cv-00523, 2014 WL 325169, at *5 (E.D. Va. Jan. 29, 2014) (in Alexandria Division, authorizing hourly rate of $325 for attorney with three years of experience in employment law case); and *Two Men & A Truck/Int'l, Inc. v. A Mover Inc*., 128 F.Supp.3d 919, 927 (E.D. Va. 2015) (in Norfolk Division, approving hourly rates of $600 for a partner and $400 for an associate in intellectual property case)).

Moreover, in a more recent civil rights action brought under 42 U.S.C. § 1983 in the Norfolk Division, Judge Jackson found an hourly rate of $350 to be reasonable for a solo practitioner with six years of experience, which is comparable to Mr. Ballard's experience. *Miller v. Mormando*, No. 2:23-cv-371, 2025 WL 242535, at *3–4 (E.D. Va. Jan. 17, 2025). And in another action brought under Section 1983 in the Richmond Division in 2012, Judge Payne authorized rates of $585.00 for experienced lead counsel and $365.00 for a senior associate. *McAfee*, 906 F. Supp. 2d at 496. Though given less weight, the requested rates are below the range

of hourly rates awarded in non-civil rights actions in this district. *E.g. Roe v. Howard*, No. 1:16-cv-562, 2020 WL 1325350, at *2–3 (E.D. Va. Mar. 20, 2020) (in Alexandria Division, approving hourly rate of $550.00 for partners and $350.00 for associates); *Fulton Bank, N.A. v. Monticello Woods Active Adult, LLC*, No. 4:19-cv-13, 2020 WL 6306386, at *4 (E.D. Va. Jan. 7, 2020) (in Newport News Division, approving hourly rates of $450 for "member attorney" and $325 for associate attorney); *United Supreme Council v. United Supreme Council of the Ancient Accepted Scot. Rite for the 33 Degree of Freemasonry*, No. 1:16-cv-1103, 2019 WL 6974308, at *4 (E.D. Va. Jan. 17, 2019) (in Alexandria Division, approving $350 hourly rate and $500 hourly rate, respectively, for associate and partner); *PRA Fin. Servs., LLC v. AutoTrakk, LLC*, No. 2:17-cv-392, 2018 WL 1472490, at *4 (E.D. Va. Mar. 26, 2018) (same, but in Norfolk Division).

Finally, other *Johnson* factors support the requested hourly rate. *Accord Carroll v. Northampton Restaurants, Inc.*, No. 2:21-cv-115, 2024 WL 1223442, at *6 (E.D. Va. Mar. 21, 2024) (considering *Johnson* factors at this step of the inquiry), *appeal dismissed*, No. 24-1354, 2024 WL 4602683 (4th Cir. May 3, 2024). **First**, as a result of NRHA's dilatory and recalcitrant conduct, both before and during this litigation, counsel had to divert valuable resources (in the form of time and funding) away from assisting other low-income clients desperately in need of their services. **Second**, not every legal issue in this case is well-settled. *See, e.g.*, *Courthouse News Serv.*, 484 F. Supp. 3d at 278 ("[T]he legal complexity is confirmed by the fact that different courts have come out to conflicting conclusions regarding the legal questions resolved in this case." (citations omitted)). It takes skilled counsel to discern such issues and persuasively address them. For example, there is a split of authority on whether punitive damages are authorized against municipalities or political subdivisions thereof. Relatedly, the case required familiarity with federal litigation generally, and civil rights litigation specifically, which counsel possesses. *See*

Ballard Decl. ¶¶ 14, 16, 18–23, ECF No. 31-1; Bonfiglio Decl. ¶¶ 11, 14–19; Hardiman Decl. ¶ 12, ECF No. 31-3.

*Third*, the case is not desirable within the local legal community. To counsel's knowledge, no local attorney in the Hampton Roads region regularly litigates FHA claims, particularly for the communities LASEV serves. Indeed, the attorneys who specialize in, or regularly litigate, FHA cases in Virginia broadly is quite limited, and many don't take these cases given the significant risk of nonpayment. *See* Hardiman Decl. ¶ 11, ECF No. 31-3. Nor does counsel believe there are many local attorneys—other than those who represent landlords—who have an innate understanding of the public housing statutes and regulations that form the backdrop of this action. *See generally* Ballard Decl. ¶ 15, ECF No. 31-1; Bonfiglio Decl. ¶ 20, ECF No. 31-2.

*Fourth*, the nature and length of Ms. Bonfiglio's unique professional relationship with Ms. Mayrant supports Ms. Bonfiglio's hourly rate. *See* Bonfiglio Decl. ¶ 22(b), ECF No. 31-2. Ms. Mayrant is reluctant to trust people, and her circumstances make it such that Ms. Bonfiglio communicates with Ms. Mayrant more than she does with other clients. It is therefore unlikely that this case would have been as successful had Ms. Mayrant even been able to retain counsel in the private market, as most private attorneys are not equipped to adequately deal with the intangible complexities that arise when representing someone in Ms. Mayrant's circumstances.

For these reasons, the hourly rates requested are reasonable.

    **c.**    **No reduction is warranted, as there are no hours spent on unsuccessful or unrelated claims, and the degree of success obtained is significant.**

The final two steps of the three-part framework are addressed in tandem. That is to say, the Court must now determine whether there are hours spent on unrelated or unsuccessful claims, and the degree of success obtained. Counsel seeks compensation for time expended in researching and drafting Count II of the complaint, that is, the abandoned disparate treatment claim. This is

appropriate. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." *Hensley*, 461 U.S. at 435. Rather, the "most critical factor" is the degree of success obtained." *Id*. at 436. Here, both claims involved a "common core of facts" and sought to vindicate Ms. Mayrant's right to be from discrimination on the basis of her disability. *Brodziak v. Runyon*, 145 F.3d 194, 197 (4th Cir. 1998) (cleaned up).

What is more, the result obtained (and to be obtained) is significant. Ms. Mayrant filed this action because NRHA refused to implement the accommodation. The permanent injunction remedies that harm, and Ms. Mayrant is entitled to punitive and compensatory damages. Beyond Ms. Mayrant, counsel is hopeful that this judgment conveys to housing authorities and other entities that they must take their obligations under the FHA seriously.

Under these circumstances, where the results obtained are significant and likely to change the defendant's behavior moving forward, the "fee award should not be reduced simply because" Ms. Mayrant abandoned the disparate treatment claim. *City of Riverside v. Rivera*, 477 U.S. 561, 569 (1986) (cleaned up).

\*      \*      \*

Applying the foregoing, the final unadjusted lodestar figure is $27,291.50. *See* Ballard Decl. ¶ 36, ECF No. 31-1 (breaking down the calculations). There is a "strong presumption" that the lodestar figure is correct. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010). However, mindful of their duty to exercise voluntary "billing judgment," *Hensley*, 461 U.S. at 434, counsel believes a 15% reduction to the final lodestar figure is fair and appropriate to account for issues that may remain notwithstanding the exclusions applied above. *E.g. Randle v. H&P Cap., Inc.*, No. 3:09-cv-608, 2010 WL 2944907, at \*7 (E.D. Va. July 21, 2010) (concluding that counsel's 10% voluntary reduction to the total amount of attorneys' fees "accounts for the vagaries of billing

practices and answers Defendants' individualized complaints[.]"), *R&R adopted in part*, 2010 WL 3834862, at *1 (E.D. Va. Sept. 23, 2010) (reducing fee award awarded to out-of-state co-counsel because his participation in certain tasks were unnecessary), *aff'd*, 513 F. App'x 282 (4th Cir. 2013); *cf. Spell*, 824 F.2d at 1402 n.17 (citing, with approval, the district court's reduction of hours by 5% "to eliminate any unreasonable duplication that might have been overlooked, errors committed by th[e] Court in denying defendants' excessive hours objections . . . and as a practical means of trimming any fat from [plaintiff's] fee petition" (cleaned up)).

Consequently, the final adjusted lodestar figure is $23,197.77. *See* Ballard Decl. ¶ 37, ECF No. 31-1 (breaking down calculations). For the reasons stated above, the Court should award this amount in its entirety.

## B.    Ms. Mayrant is entitled to recover $501.50 in costs.

Ms. Mayrant seeks reimbursement for the $405.00 filing fee, ECF No. 1, and $96.50 for the two occasions on which she served NRHA with process. ECF No. 31-6. The filing fee is authorized by 42 U.S.C. § 3613(c)(2) and 28 U.S.C. § 1920(5). The private service fees, on the other hand, are plainly authorized by 42 U.S.C. § 3613(c)(2).[6] That is because, as several courts have held, fee-shifting statutes authorize a "far broader range of expenses than costs that are taxable" under 28 U.S.C. § 1920. *Tsombanidis v. City of W. Haven, Connecticut*, 208 F. Supp. 2d 263, 286 (D. Conn. 2002) (citations omitted); *see also, e.g.*, *Redd v. Empowerment Clinical & Consulting Servs., LLC*, No. 3:12-cv-00737, 2015 WL 4092767, at *1 n.2 (E.D. Va. July 6, 2015)

---

[6] Ms. Mayrant acknowledges the six-way circuit split on whether 28 U.S.C. § 1920(1) authorizes private service fees in addition to those incurred from using a marshal. *Qayumi v. Duke Univ.*, 350 F. Supp. 3d 432, 435–36 (M.D.N.C. 2018) (collecting cases). The Fourth Circuit has yet to weigh in on this issue. *Id.* at 436. Nor have the district courts in the Fourth Circuit "reached [a] consensus[.]" *Id.* (collecting cases). However, because Ms. Mayrant also relies upon 42 U.S.C. § 3613(c)(2), the Court need not weigh in on this question.

(citations omitted); *Williams v. Am. Homestead Mgmt.*, No. 4:04-cv-56, 2005 WL 1118118, at *4 (W.D. Mich. May 11, 2005) (FHA case). Hence, a fee award here "include[s] those reasonable out-of-pocket expenses incurred by [Ms. Mayrant's counsel that are] ordinarily charged to [] clients." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (citations and internal quotation marks omitted). Service of process fees are customarily borne by lawyers' clients. *E.g. JTH Tax, LLC v. Manzo*, No. 2:24-cv-505, 2025 WL 2058884, at *7 (E.D. Va. July 23, 2025) (relying upon *LeBlanc-Sternberg* to award fees incurred from repeated service attempts). And because Ms. Mayrant's costs are reasonable, the Court should allow them.

## III.   The Court should award post-judgment interest.

"[F]ederal law mandates the awarding of post-judgment interest." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) (en banc) (citing 28 U.S.C. § 1961); *see also U.S. Bank Nat'l Ass'n v. B. S. Carriers, LLC*, No. 7:23-cv-00471, 2024 WL 549904, at *5 (W.D. Va. Feb. 12, 2024). By extension, a party's failure to demand or request post-judgment interest in the complaint or by motion is inconsequential. *See Contitech USA, Inc. v. McLaughlin Freight Servs., Inc.*, 91 F.4th 908, 915 (8th Cir. 2024); *see also Perry v. Isle of Wight Cnty.*, 311 F. Supp. 3d 751, 757 (E.D. Va. 2018) (awarding post-judgment interest despite plaintiff's failure to request it). Ms. Mayrant is thus entitled to the statutory post-judgment interest rate. 28 U.S.C. § 1961(a) (setting interest rate at "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding.").

## CONCLUSION

Ms. Mayrant should have never been forced to bring this action. The accommodation requested is rudimentary, NRHA is a sophisticated entity that is well aware of its FHA obligations, and Ms. Mayrant's disability and need for the accommodation has always been apparent. Ms. Mayrant leaves it to the Court's discretion as to whether a hearing is advisable. Indeed, Ms.

Mayrant stands ready to provide live testimony if it will aid the Court's decision-making process. But the relief requested, while significant, is just and appropriate under the particular facts of this case.

Dated:  October 23, 2025

Respectfully submitted,

**JASMINE MAYRANT**

By:      */s/ Brandon L. Ballard*
Brandon L. Ballard (VSB No.: 95346)
Melissa B. Bonfiglio (VSB No.: 90016)
LEGAL AID SOCIETY OF EASTERN VIRGINIA
125 St. Paul's Blvd., Suite 400
Norfolk, VA 23510
Ph: (757) 648-1241
Fax: (757) 622-8102
Email: brandonb@laseva.org
Email: melissab@laseva.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October 2025, I electronically filed the foregoing using the CM/ECF system, which will then send a notification of such filing to counsel of record.

By:      /s/ Brandon L. Ballard